JOHN PELS, Appellant, v. HENRY STEVENS et al., Appellees.

WITNESSES: Competency—Transactions with Deceased—Action by
1 Heir Against Uncle. Sec. 4604, Code, 1897, prohibiting testimony as to personal transactions with deceased persons, is not applicable in an action by an heir and devisee to set aside a quitclaim deed, which he was induced to sign by the fraud of his uncle, who was living, and an opposing witness.

APPEAL AND ERROR: Review—Scope and Extent in General—
2 Trial De Novo—Setting Aside Deed for Fraud. An equitable action to set aside a deed on the ground of fraud is triable *de novo* in the Supreme Court, and not upon errors; and the court takes the record as it finds it written and presented.

ESTOPPEL: Signing Instrument Without Reading. A person who
3 can read and write, and is not impeded in so doing, is estopped from saying afterwards that he did not know the contents of the instrument which he signed, and its legal effect upon his rights.

DEEDS: Cancellation—Fraud—Laches—Insufficient Evidence. Evi-
4 dence reviewed, in an action to set aside a deed for fraud, and *held* that the grantor was not guilty of laches in not making inquiry as to the contents of the instrument signed by him.

DEEDS: Validity—Fraud—Conspiracy. Evidence reviewed, and
5 *held* that a grantor was induced by the fraudulent representations of his uncle to sign, without reading, and believing it to be a different instrument, a deed of his interest in land, which he held unknowingly under a will, and that the grantee conspired to accomplish that result.

DEEDS: Validity—Fraud—Relationship—Presumptions—Burden of
6 Proof. In an action to set aside a deed, claimed to have been secured by fraudulent representations, the burden was on the grantor's relatives, on account of the grantor's confidence and

trust in them, and his close relationship, to show that the transaction was a fair, open, and honorable one.

LIMITATION OF ACTIONS: Computation of Period—Cancellation
7 of Deed for Fraud. An action to cancel a deed for fraud is one "heretofore solely cognizable in a court of chancery," and is not barred by limitations under Sec. 3447, Subdiv. 6, Code Supp., 1913, and such limitation does not commence to run until the fraud has been discovered by the aggrieved party. Sec. 3448, Code, 1897.

LIMITATION OF ACTIONS: Computation of Period—Discovery of
8 Fraud—Filing of Deed—Constructive Notice. A cause of action to set aside for fraud a deed fraudulently obtained did not accrue, so as to start the statute of limitations to running, under Sec. 3448, Code, 1897, upon the filing of the deed, as the same did not charge the grantor with a notice essential to start the running of the statute of limitations against him, and his knowledge, if any thereby, could not be other than constructive. The purpose of the recording act is not to charge the immediate parties with constructive notice of the contents of the instrument they have executed, but to notify subsequent purchasers and incumbrancers of the rights such instruments are intended to secure.

*Appeal from Carroll District Court.*—M. E. HUTCHISON, Judge.

JULY 7, 1919.

REHEARING DENIED OCTOBER 22, 1919.

ACTION to set aside a deed on the ground of fraud. Decree for the defendants, dismissing plaintiff's petition. Plaintiff appeals. Opinion states the facts.—*Reversed.*

*Reynolds & Meyers* and *L. H. Salinger*, for appellant.

*Chas C. Helmer* and *Lee & Robb*, for appellees.

GAYNOR, J.—This action was commenced on the 30th day of December, 1911. It was brought to set aside a certain quitclaim deed executed by the plaintiff, and to quiet title in him to the land described in the deed. Prior to the

1st day of August, 1894, the land was owned by one Gerhard J. Stevens, who died on or about that date, testate, leaving surviving him his widow, Mary Stevens, Henry and Herman Stevens, sons, and Mary Korwes, a daughter, and the plaintiff herein, John Pels, the only child of a deceased daughter. His will was admitted to probate September 6, 1894. At the time of his death, he was the owner of a certain 109 acres of land known as the "home farm." He also owned 240 acres of land in a separate tract. This is the land in controversy. In his will he bequeathed to the plaintiff, John Pels, the 109 acres which was occupied as a home, and known as the "home farm." The 240 acres he bequeathed, share and share alike, to his three children and to the plaintiff. The will, however, gave the wife a life estate in all the land. John Pels, the plaintiff, is the only son of the testator's dead daughter. He came to live in the home of the testator when he was about six months old, and continued to live there until the death of the testator. He was then about 15 years of age. After testator's death, he continued to live with his grandmother, Mary Stevens, on the home farm, and cultivated it under some arrangement with his grandmother by which he paid her rent.

On the 2d day of January, 1902, this plaintiff executed a quitclaim deed to all his interest in the 240 acres to his uncles and his aunt, defendants herein. His grandmother, Mary Stevens, joined in this deed. At the same time, these sons and daughter executed a life lease of this 240 acres back to their mother, Mary Stevens. On the 15th day of June, 1909, Herman Stevens, one of the sons, died, leaving a will in which he bequeathed all his property to his wife, the defendant Katherine Stevens. Thereafter, Mary Stevens, who had reached the age of 96 years, was found to be of unsound mind, and made subject to guardianship.

It is the claim of the plaintiff, John Pels, that he was

induced to sign the deed through the fraudulent machinations of his uncles, and he says in his petition, as a basis for such claim, that Henry Stevens, one of his uncles, falsely and fraudulently said to him "that, in order to settle the estate of the grandfather in a proper manner, it was necessary for all of the heirs to sign certain papers; that, unless such papers were signed, if any of the heirs should die, the estate of the grandfather could not be closed, and the heirs could not receive their shares until the youngest child of such deceased heir had reached the age of 21 years;" that, when Henry made this statement, it was not only false, but he knew it was false, and made it to mislead, deceive, and defraud the plaintiff, and to induce him to sign the certain paper which plaintiff has since learned to be a quitclaim deed; that, as a matter of fact, Henry Stevens, Mary Korwes, and Herman Stevens conspired together to cheat this plaintiff out of his interest in said real estate; that Henry was, at the time, assisting his mother, Mary Stevens, who was appointed executrix of the will, in the administration of the estate, and was also testamentary guardian of this plaintiff; that plaintiff had never had any experience in executing legal papers; that his Uncle Henry requested him to meet the other heirs (that is, his uncles, his aunt, and his grandmother) in the town of Carroll on the following day for that purpose; that he, the plaintiff, relying upon this statement that it was necessary, in order to settle the estate, that he sign certain papers, appeared with the other parties at the town of Carroll, as requested; that the paper was there, prepared for his signature, and lying on the table; that he signed the same, supposing that the paper was simply a paper made to facilitate the closing of the estate; that he signed without acquainting himself with the contents, and without having the same read over to or explained to him, because of the confidential relations existing be-

tween him and Henry, and because of the reliance on Henry's statements as to the necessity and effect of signing the papers; that he later learned that the paper was not what he had supposed it to be, and was not as it was represented to him, but was a quitclaim deed of his interest in the 240 acres; that he received no consideration for signing the deed; that he never delivered the deed, as a deed, to anyone; that the paper was signed under a mistake of fact as to what the paper was; that it was filed for record, and is now a cloud upon his interest in the 240 acres; that he never saw his grandfather's will, and did not know, and was never told, that he had any interest except in the 109 acres; that he did not know, and was not told, that he had any interest in the 240 acres; that his interest was fraudulently concealed from him; that he had no knowledge, at the time, that the paper so signed was a quitclaim deed of his interest in any property owned by him; that he did not learn that it was a quitclaim deed of his interest in the real estate until the fall of 1911; that, in fact, under the terms of the will at the time it was probated, he became vested with an undivided one-fourth interest in this 240 acres of land mentioned in the quitclaim deed, and was entitled, under the will, to a one-fourth interest therein; that Mary Stevens has been in possession of said real estate ever since the death of her husband, Gerhard, holding it as a life tenant.

John Pels, the plaintiff, is the lone witness to sustain the allegations of this petition. Before entering upon a review of his testimony, we must dispose of a matter urged at the threshold. It is said that John Pels was not a competent witness to testify, because of the inhibition in "the dead man's statute;" that he is one of the parties to the suit, and Herman is dead, and one of the other parties, Mary Stevens, is insane.

1. WITNESSES: competency: transactions with deceased: action by heir against uncle.

It appears that, if any fraud was practiced upon this plaintiff, if he was circumvented and misled into signing something the contents of which he did not know, if he was fraudulently induced to sign the deed, it was through the instrumentality of Henry, who is now living. The section invoked provides:

"No party to any action or proceeding, nor any person interested in the event thereof, shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the commencement of such examination deceased, insane," etc. Code Section 4604.

All the transactions and all the personal communications to which this plaintiff testified that have bearing upon the fraud charged, and which, if accepted, serve as a basis for granting the relief prayed for, were not with the dead party, nor with the party now insane. The party with whom the transaction was had is living, and was a witness in this suit. The object and purpose of this statute is to close the mouth of the living, when he is a party interested in a suit, as to any personal transaction or personal communication with the deceased person: this because the deceased person cannot respond to, contradict, or combat the statements so made. The theory is that the mouth of the party to the suit is closed by law when death has sealed the lips of his opponent. There is no reason for the application of the rule here. The party by whom the fraud, if any, was perpetrated, the party with whom the transaction testified to was had, is living and able to speak. It is not claimed that the others were present at the time the original statements were made on which the charge is predicated. So far as this record shows, it was made by Henry to the plaintiff, before the meeting in Carroll; and what Henry said was the inducing and moving cause of plaintiff's going to Carroll. It was Henry who closed plain-

tiff's mouth to questioning. It was what Henry said that induced his action. The others were present at the consummation of the fraud, and, with knowledge of it, accepted and retained its fruit. The record shows that Henry was familiar with the will; knew its contents; had read it many times; was acquainted with the rights which this plaintiff had in the land; and so were the others; and, we must assume from the record, knew, at the time, that the execution of a quitclaim deed was not necessary in the settlement of the estate. Its only effect was to rob Pels, the plaintiff, of his interest in the land bequeathed to him by his grandfather, and transfer it to the defendants. Pels was a competent witness, except for the statute, and the statute itself does not close his mouth. As supporting this proposition, see *Johnson v. Townsend,* 117 N. C. 338 (23 S. E. 271). It appears that the statute of North Carolina, in respect to this matter, is substantially the same as our own. See, also, *Peacock v. Stott,* 90 N. C. 518. So we hold that Pels was a competent witness in this case.

Before reviewing Pels' testimony, we have to say that the record discloses that his mother died while he was yet a baby. He was taken into his grandfather's home, and lived with his grandfather until the death of the latter. Thereafter, he continued to live with his grandmother. He married at the age of 25. We are not advised just how long the grandmother lived with him after that. He had but little education, had never traveled, could read and write, but never had any experience in business matters beyond such as came to him upon the farm. Eight years elapsed between the death of his grandfather and the signing of this deed. During that eight years, he was a tiller of the soil. His grandmother, aided by his uncle Henry, administered the estate. They were familiar with the property left by the father and grandfather, and with the disposition he made of it. It cannot be doubted, from this record, that

they all knew that plaintiff had a one-fourth interest in the 240 acres through that will.

It appears that Henry was named guardian of the plaintiff in the father's will; Mary Stevens, the wife, was made executrix. Henry never qualified as guardian, although, in some instances, he seems to have assumed the part of a guardian. Plaintiff was asked:

"Did your Uncle Henry ever tell you he was your guardian in person? A. There was talk in the family about his being my guardian. I never heard how he got to be my guardian, but I did hear that he was, and did believe that he was my guardian. My grandfather talked to me about Henry being my guardian. At the time I was 21, Henry gave me a team of horses, but he didn't tell me why it was given to me."

It appears that, in the will, the grandfather provided that this grandson should have a team of horses when he was 21 years of age; that, for many years after the probate of the will, the plaintiff paid rent for this 109 acres bequeathed to him in the will. All the arrangements made for the renting, he testifies, were made with Henry; Henry was the man he went to see about staying on the place, and the man with whom he made the deal about paying half the crop as rent. He testifies:

"After I got married, I made another deal with him for cash rent of $300 a year. These arrangements were not made with my grandmother. After I got married, grandmother didn't leave then. She lived there six or seven years. We were good friends. She was always kind to me. My grandmother's children were all grown up. There were no other children living at the home. I was first told that I had an interest in the 240 acres and had signed a quitclaim deed to it in 1911. That was the first time I learned that I had signed a quitclaim deed."

He then testifies that, before he signed the paper, a day or so, he met Henry at church in Roselle.

"He said something to me about signing a paper. He said they had to fix up a paper, some kind of a business, and that they wanted to divide the property after the grandmother was dead, and they couldn't do it this way, if she should die; so then the youngest child had to be of age before they could divide otherwise the estate [the grandfather's estate]. Q. That, unless this paper was signed, the estate of your grandmother could not be divided after your grandmother's death until the youngest of the related children, yourself, or anybody else, came of age? A. That is, if either one of them died, Herman, or Henry or Mrs. Korwes. Q. That is, unless these papers were signed, none of the rest of you who were alive could get your share until the youngest child became of age? * * * I believed what he said. He said he would go to Carroll and fix it up the next day; that I had to sign it. He said, 'Just come up to Judge Powers' office in Carroll and sign it.' * * * I came to Carroll the next morning. Saw the family. Saw some of them on the street a little before. One of the parties said I should wait until they called me. When they called me, I went to the office. When I got into the office, all the parties were there, my two uncles, my aunt, and my grandmother. Mr. Powers was the lawyer. I had never been in a lawyer's office before, and never signed any kind of a legal paper or business paper before, that I remember of. There was a paper there, after I got into the office."

He was asked this question:

"Did somebody hand you the paper? A. No. Q. Who spoke to you about the paper, after you got there? A. Well, I can't tell you who it really was, whether it was Henry or Herman, one of the two. Q. Well, just tell what happened after you got up there. A. Well, they told me it

was lying on the table there. They showed me where I should sign it. On a line. I signed it. Didn't read it. It was not read to me. Nobody told me what was in it. I thought it was the kind of paper they had drawn up to divide the estate after while. I thought it was the kind of paper Henry told me about. Nobody explained the paper to me. After I had signed it, it laid right on the table. I didn't know I had any interest in this property at that time. I knew that, when my grandmother died, I would get the 109 acres. That had been told to me. All that I knew was that I had a chance to get 109 acres. That had been told to me. All I knew was that I had a chance to get 109 acres when my grandmother died [meaning the home place]. Henry Stevens never told me that I owned any ininterest in the 240 acres. Nobody told me that I had an interest in that tract. As soon as I had signed the paper, they told me I should go down; that I was done now. I thought the paper would stay with the estate. I thought it was to go with the papers in the estate. I never read my grandfather's will; never saw it until four or five years ago. I never received a dollar for signing this paper or anything else. I never received anything from my grandfather's estate except a team of horses and some machinery that was on the farm. There was nothing said about the machinery. It stayed right on the place. It was there when I came of age. I kept right on using it."

The defendant Henry Stevens, called for the defendants, testified that he was in the office of Judge Powers at the time the quitclaim deed in question was made; that they were all there; that he was not in the office of Judge Powers before plaintiff came up; that they went up all together; that Pels was up there all the time the matter of fixing up the estate was discussed in Judge Powers' office. He further testified:

"I talked with Pels the day before. I asked him to come up."

He was asked this question:

"Did you tell him what you wanted him to come for? A. No, sir, because I didn't know what we would come up for, ourselves. I told him, I says, 'We will go up to Carroll and see Mr. Powers about it, and see what advice he would give us.' I just simply asked him,—I didn't tell him to come."

He was asked this question:

"Well, what did you tell him that you wanted him to go and see Powers about? A. I simply asked him; I didn't tell him. I simply asked him whether he was satisfied with the conversation and with the talk I and him had together, and if he was, we would go up to Powers and see. I and Mr. Pels had a talk. Of course, they kind of refused,— that was the day before. Q. Who kind of refused? A. That is, the attorneys. I spoke to Mr. Pels the day before, and mentioned the will, and told him there could be lots of trouble about the will. I told him it was pretty hard to make out what really the meaning of the will was, not unless we could settle this among ourselves; and that we would like to know about the 240 acres,—who was to get it."

He was asked this question:

"Isn't it true that you had been told, at least a dozen times, that he had a share in the 240 acres? A. Well, I had a copy of the will, and I don't know that the will gave it to him. Not the way I understand it. Q. Didn't you know that, under the will, they all got an equal share in the 240? A. That is why I told him there could be trouble with it, and it was pretty hard to understand the will. Judge Powers never told me, that day when we were up there, that he had an equal part in the land. I didn't know, after I talked with Judge Powers that day, the will

of my father gave John Pels the same interest in the 240 acres of land that we did. He didn't tell me. Q. Did Judge Powers give you any reason for taking a deed from John Pels? (No answer.) Q. Why did you want a deed from John Pels to the land which you say he didn't own? A. I didn't say that at all,—that he didn't own it. Q. You didn't? A. No sir, I didn't; because that was why I thought that there could be, and told Pels that there could be, a lot of trouble about it. I really doubt whether Judge Powers knowed anything about the will,—we didn't have the will with us. When I came to Powers' office, I told him what we wanted, and what we had agreed to do among ourselves,—that is, what we agreed upon; that we were going to settle this among ourselves, about the 240 acres. Then, of course, we asked Mr. Powers for advice, to tell us what he thought, which way it could be fixed. And he advised my mother and Pels to give us a quitclaim deed to that 240 acres, and he advised me and my brother and sister to give mother a life lease. Now that is nearly all that was said in Mr. Powers' office, and the papers were drawn up and signed. I and my brother and sister signed the lease, and Pels and my mother signed the quitclaim deed."

He was then asked this question:

"You say it was all arranged and understood between you,—if it was understood between you and Pels on that day, and all of you, that he was to let go of his 60 acres, or whatever his share was in the 240, and that the grand-mother was to have the 109 acres as her homestead? A. Whether it was understood that way? Q. Yes. A. That is, I understood it that way, but whether they understood it that way, I don't know. I don't know what Mr. Pels and mother understood."

The evidence discloses that no suggestion was made, at the time Pels signed this paper, that the others should make a quitclaim to him of the 109 acres.

Henry further testified:

"I had read this will many times. Had discussed it thoroughly. I knew the will made me guardian of John Pels. I was his uncle. I knew that the will told me to see that he was to be well educated. I spoke to him once, and asked him. I have done that as his uncle, which I did, but not as his guardian. I asked him, I says, 'John, do you want to go to school?' He answered, he said, 'No, I went to school long enough.'"

Judge Powers was a witness in this case. We omit any discussion of his testimony, because the record discloses that he has no personal recollection of the transaction involved in this suit as the same occurred in his office, and his testimony has no probative force upon any of the issues tendered. It appears that he acted in a perfunctory way, clothing in legal form and phrase what he was told had been agreed upon by the parties interested in the matter submitted to him. He clothed in legal form what he was given to understand had already been determined upon and agreed to by all the parties.

In a general way, the testimony shows that Henry acted for his mother, who was executrix of the will, in handling the estate.

This case is triable *de novo* here, and not on errors. We take the record as we find it, and from the record, as written and presented, determine the rights of these parties under the law. It is true that this record discloses that there were no physical obstacles in the way of plaintiff's reading and knowing the contents of this instrument before he signed it. It is true that he could read and write; that the instrument was prepared and laid before him for his signature. It is true that it was his duty to use ordinary care and prudence to ascertain what the instrument was, and to know its con-

2. APPEAL AND ERROR: review: scope and extent in general: trial *de novo*: setting aside deed for fraud.

tents before he signed it.    No fraud was

**3. ESTOPPEL:**
**signing instru-**
**ment without**
**reading.**

practiced, at the time of the signing, to lead his mind away from the character of the instrument to which he attached his signature.    Ordinarily, this would be sufficient to prevent his questioning the instrument; and ordinarily, this would estop him from saying that he did not know the contents of the instrument, and did not assent to it at the time of affixing his signature.    See *Wallace v. Chicago, St. P. M. & O. R. Co.*, 67 Iowa 547; *McKinney v. Herrick*, 66 Iowa 414; *Jenkins v. Clyde Coal Co.*, 82 Iowa 618.    This is the general rule.    It is further settled by almost all, if not all, adjudicated cases that a person is presumed to know the law, and presumed to know the contents of the instrument which he signs; and when it appears that he can read and write, and that the instrument was before him, and that nothing transpired to prevent him from reading and knowing the contents of the instrument, he is estopped afterwards to say that he did not know the contents of the instrument and its legal effect upon his rights.    These are rules of general application, and have their founda-

**4. DEEDS: cancel-**
**lation: fraud:**
**laches: insuffi-**
**cient evidence.**

tion in reason.    The mind is supposed to be the seat of intelligence, guiding and controlling the actions of the body.    It sits at the threshold of all action, to protect and guard every interest that affects its possessor, whether it be of person or of property.    When the body acts, its act is presumed to be under the direction of the mind; and the mind, directing and controlling the action, is presumed to control and direct intelligently, with a comprehension of the thing done, its purpose, and its effect.    Opiates, however, may be administered, which destroy the intelligent action of the mind and bring it to submission to the will of another, without conscious power of resistance.    The mind, alertly suspicious of any invasion of recognized right, ordinarily

closes the door to the invader. But this alert suspicion may be doped into quiescence, and the ordinary guards rendered inoperative for protection. The activities of the human mind depend upon many conditions. Its alertness depends upon whether the circumstances suggest the need of alert action for protection. It is quite impossible to lay down any general rule by which the action of men can be approved or condemned. It depends on so many conditions, so many circumstances, the nature and character of the act to be performed, the circumstances under which it is performed, and the relationship existing between the actors. So we have our rule governing the rights of parties when there exists between the actors a relationship of confidence and trust. One who secures the confidence of another, one who has, and knows he has, the confidence of another, and induces him to act to his prejudice, cannot defend against the act by showing, defensively, that the mind of the other should have been alert to the situation; that, if it had been alert, and had stood with drawn sword at the portals of his right, the imposition never could have been made effectual. Shakespeare, in irony, said:

"What a fool honesty is; and trust, his sworn brother, is a very simple gentleman indeed."

Here in this record we have this young man, ignorant, unschooled, unacquainted with the ways of the world, uninformed in business transactions, with no knowledge of his rights in the matter which was the subject of this meeting, in a lawyer's office, surrounded by his closest friends, his aunt, his uncles, and his grandmother, the only mother he ever knew, signing a paper, without reading or ascertaining its contents, conveying his interest in a valuable tract of land, without being informed of the contents of the paper, without being told of his rights in the premises; and we are asked to say that he is now estopped to claim that any imposition was practiced upon him, be-

cause of his laches in so signing. He was invited to come there by his uncle, whom he believed to be his guardian, and who assumed to be his guardian; was told to be present in Carroll on the morrow to sign a paper, not for the purpose of conveying his interest in this land, but for the purpose of enabling those in charge of the grandfather's estate to close the estate at an earlier date than it could be closed under then existing conditions,—a paper that must be signed by all, to the end that an earlier closing of the estate, in the interests of all, might be brought about; was told that, unless this paper was signed, no one having an interest in the estate could receive his share, upon a division of the estate, until the youngest heir of all the living should attain the age of 21. Taking his version as true,—and we think it is,—he came on the morrow, and was ushered into this office at Carroll. The will was not there; the contents of the will were not discussed; his interest in the land in question was not discussed; his friends were all gathered, evidently looking to a common purpose,—but not the purpose disclosed in the communication made to this plaintiff. Henry's testimony is that it was said to Judge Powers:

"We have arranged for a division of the estate. What is the best way to do it?"

He told Judge Powers what they had agreed upon,— by "they," evidently meaning the brothers and sister. The grandmother was an old woman, and could neither speak, read, nor write English. The conversation with Judge Powers was carried on in English. We must assume that Judge Powers, who knew nothing of the contents of the will, who knew nothing of the rights of the parties under the will, gave to these parties the advice which resulted in the making of the deed, and bottomed it on what was communicated to him there by these parties. "We have agreed," Henry said; and we must assume that the agree-

ment is expressed in the writings then prepared by Judge Powers. The instrument shows that plaintiff and the mother conveyed all their interest in the 240 acres to these two uncles and this aunt, who had "agreed" that this should be done. "And we have agreed that we will make a life lease to mother, after we have secured Pels' interest in the 240 acres."

There is some dispute in the record as to when Pels came into this office. His testimony is that he was told to remain out of the office until he was called; that, when he was called, the instruments were already prepared, and he was directed to place his signature on a certain line on a paper, and then told that he was through, and could go. He went. The instrument was never referred to by any of these defendants again in the presence of the plaintiff. It was immediately placed of record, and these defendants are claiming title under it.

Certain ultimate facts appear from this record. Plaintiff had a one-fourth interest in this 240 acres. That interest came to him through his grandfather's will. These defendants secured this interest from him without paying him anything therefor. They all knew what his interest was. They all knew they could not secure that interest except through conveyance from him. We think the record fairly shows, indulging in reasonable and proper inferences from what is shown, that these parties conspired together to get this boy into this office, that they might secure from him, to themselves, his rights in this property. No one pretends to say that he knew his interest in this land. No one pretends to say that he had any knowledge of the contents of the instrument; and Henry does not deny that he induced him to come there on that day, on the false supposition that he was only to sign a paper that would enable them more readily to adjust the estate. Hen-

5. DEEDS: validity: fraud: conspiracy.

ry, it is true, pleads some ignorance touching the rights of this plaintiff in this land, but we think the whole record and his own testimony negative his plea. That the plaintiff had confidence in these parties and in their integrity, and reposed trust in them, and was, by this drugged-into quiescence, thrown off his guard, and induced to act without the prudence that ordinarily attends the acts of intelligent men, this record makes plain. If the plaintiff acted without that prudence and caution which he should have exercised under ordinary circumstances, and by the exercise of which he would have known the contents of the instrument, it cannot be pleaded by these defendants as a bar to the recovery of the fruits of their ill-gotten gain. The burden was on the defendants, because of this confidence and this trust, and the close relationship of dependency, to show that the transaction was fair, open, and honorable between them. They cannot seal his eyes to what is going on, and then charge him with laches because he did not tear the seal from his eyes before he acted.

6. DEEDS: validity: fraud: relationship: presumptions: burden of proof.

It is claimed, however, that the length of time elapsing between the making of the deed and the bringing of this action bars him from any right to the relief prayed for.

On what theory this may be maintained, is not made plain. Whether it is claimed that, by the exercise of reasonable diligence, he should have discovered the fraud practiced upon him, and brought his action sooner, and, therefore, was guilty of laches in not discovering the fraud and proceeding against them earlier, or whether it be claimed that the statute of limitations bars his right of action, we have to say that, whichever of these claims be relied upon, they are not tenable. He had no reason to suspect the fraud, and, therefore, no reason for inquiry. He had placed his trust and confidence in those who were man-

aging the estate, to deal fairly with him. The will had never been shown to him, and he was never acquainted with its contents. The only information that he received was that, at the death of his grandmother, he would be entitled to the 109 acres. Until something happened to put him upon inquiry, he cannot be charged with laches in not making inquiry. The property stood, and must stand, in the same situation after the execution of the quitclaim deed that it would have stood if no deed had been executed. The mother had a life interest in the property, under the will. At the time this deed was made, these children made a lease to her of a life interest. Undoubtedly, she was treated as having a life interest in the land during all these years. There was nothing to put him upon inquiry by reason of the management of this property,—at least, the record discloses nothing. She had a life interest, under the will, in this same land, and she had a life interest under the lease that was executed at the time this deed was made; and the record does not disclose any act on the part of any of these defendants, during all these years, that indicated a claim of a right in the property adverse to this plaintiff.

He did not discover the fraud practiced on him, and did not discover the fact that the instrument signed was a quitclaim deed, until 1911. This action was then commenced. Ten years had not elapsed between **7. LIMITATION OF ACTIONS: computation of period: cancellation of deed for fraud.** the perpetration of the fraud and the commencement of this suit. If we treat this as an action to recover real estate, then the statute does not bar the action. If we treat it as an action to set aside the conveyance on the ground of fraud, then the action is not barred, under Subdivision 6 of Section 3447 of the Code of 1897, for the reason that this action is one heretofore solely cognizable in a court of chancery. Code Section 3448 provides that the action shall not be deemed to have accrued, so that the stat-

ute of limitations will start, until the fraud has been discovered by the party aggrieved. The filing of the deed for record did not charge the plaintiff with the notice essential to start the statute of limitations against him. His knowledge, if any, could not be other than constructive. See *Markey v. Chicago, M. & St. P. R. Co.,* 171 Iowa 255; *Mitchell v. Simons,* (Tex.) 53 S. W. 76; *America F. L. Mtg. Co. v. Pace,* 23 Tex. Civ. App. 222 (56 S. W. 377). It is not the purpose of the recording act to charge the immediate parties with constructive notice of the precise contents of the instrument they execute, but to notify subsequent purchasers and incumbrancers of the rights such instruments are intended to secure. Therefore, it cannot be said that the action was not commenced within the time limit of the statute.

8. LIMITATION OF ACTIONS: computation of period: discovery of fraud: filing of deed: constructive notice.

Other matters are discussed, but we think this is sufficient to control the rights of the parties. We think the plaintiff is entitled to the relief prayed for, and that the court was wrong in dismissing his petition.

It appears that, since this case was commenced, the widow has elected to take her distributive share.

This decree should put the parties back where they would have been had no deed been executed, and their rights are left open to further adjudication. The case is reversed, and the decree ordered in accordance with this opinion.—*Reversed.*

LADD, C. J., WEAVER and STEVENS, JJ., concur.