F. L. DAVIS and MINNIE DAVIS, Appellants, v. DES MOINES & FT. DODGE R. R., M. & ST. L. R. R., GEORGE SIMPSON, PETER REYNOLDS, HOLLINGSWORTH COAL COMPANY, IOWA PORTLAND CEMENT COMPANY and CHICAGO ROCK ISLAND & PACIFIC R. R. CO., Appellees.

**Eminent domain:** PRIVATE USE OF PROPERTY: INJUNCTION: COLLATERAL. ATTACK. The question of whether condemnation proceedings are in fact unauthorized, because the land to be taken is to be used for a purely private purpose, can be raised and determined in the condemnation proceedings and on appeal therefrom; and an independent action in equity to enjoin the use of the property based upon that question alone is a collateral attack upon the condemnation proceedings and will not lie.

**Same:** RIGHT OF WAY: UNAUTHORIZED USE: EVIDENCE. The assignees of a lease have no greater rights thereunder than their assignors. So that where the assignors acquired a right of way for track purposes, limited to the life of the lease and solely for constructing a railroad for a purely private purpose, a subsequent use of the right of way by the assignees of the lease for general passenger and freight business was unauthorized; and where the lease itself did not specify the purpose for which the road was originally intended parol evidence was admissible to show such purpose.

**Same:** ESTOPPEL. Where it was sought to enjoin the use of a railroad for carrying passengers and cement products, the right of way having been originally acquired for sole use in connection with a coal mine, the plaintiff was not estopped from resisting a diversion of its use by the fact that he knew of the construction of the cement plant, where there were other convenient railroads with which it might be connected, and proper objection was made to condemnation proceedings for acquiring a strip of land necessary to connect with the track, and such public use of the right of way was not begun until after commencement of this action to enjoin the same.

*Appeal from Polk District Court.*—HON. LAWRENCE DE GRAFF, Judge.

TUESDAY, MARCH 13, 1912.

SUIT in equity to enjoin defendants from using certain railway tracks over plaintiff's land, except to reach a coal mine near plaintiffs' property. Defendants claim the right to use the tracks under the terms of a written lease and in virtue of certain condemnation proceedings instituted by the defendant, Des Moines & Ft. Dodge Railroad Company. Plaintiffs say that the lease is not broad enough in its terms to cover the use being made of tracks, and that, if it is, it should be so reformed as to give defendants nothing more than the privilege of hauling coal over the tracks, and that the condemnation proceedings are void, because instituted for a private purpose, and invalid, because in fact instituted by a private corporation, to wit, the cement company and for its individual use. An estoppel was also pleaded by defendants. On these issues, the case was tried to the court, resulting in a decree dismissing plaintiffs' petition, and they appeal.—*Affirmed* in part and *reversed* in part.

*J. G. Myerly,* for appellants.

*Geo. W. Seevers, W. H. Bremner,* and *E. D. Samson,* for appellees Des Moines & Ft. D. R. Co., and Minneapolis & St. L. R. Co.

*Guernsey, Parker & Miller,* for appellee Iowa Portland Cement Co.

DEEMER, J.—In August of the year 1904, plaintiffs leased to George Simpson and Peter Reyolds the coal under about fifty-seven acres of land owned by them, located in the southwestern part of the city of Des Moines. This

lease was in writing, and, among other things, it granted the lessees the following:

The said party of the first part also grants to the said party of the second part a strip of surface for a right of way across the above described land for a railroad track to the mine of the party of the second part, which the party of the second part expects to locate on the land of the T. E. Brown estate. The said party of the second part agrees to pay for the above considerations the sum of twelve and one-half (12½) cents per ton on all lump coal they mine from underneath said land and they further agree to pay to the said party of the first part the sum of $2.00 per acre per year as advance royalty from August 1, 1904, until they commence to mine coal from said premises, said advance royalty to apply on coal mined when said second party reaches said coal with their entries and driveways. . . . The said first party also agrees to permit the said second party to prospect for coal any time during the first six months after the date of this agreement and if they fail to find workable coal, then this lease shall have no further force or effect and in that event the said second party agrees to pay the said first party a reasonable price for the surface of the land taken up for a right of way. . . . This lease to continue for twenty (20) years, or until the workable coal is exhausted.

This lease was assigned to the Hollingsworth Coal Company, which sunk a shaft on land adjoining that of plaintiffs on the west, and commenced taking coal from under plaintiffs' land some time in the year 1905, through the shaft just mentioned. The Hollingsworth Company assigned all its right, title, and interest in and to the right of way provided for in the lease to the Des Moines & Ft. Dodge Railroad Company, and the railroad company agreed, as part consideration for the assignment to build a railway to the shaft. The exact provision with reference to this railway was as follows:

The said railroad company agrees to construct upon a right of way to be procured and furnished for that purpose

by the coal company a single track railroad extending from a connection with the main line track of said railroad company at a point about one-half mile east of Valley Junction, in Polk county, Iowa, to the mine of the Hollingsworth Coal Company, in the southwest quarter of section 13, township 78, range 25, Polk county, Iowa and to construct and operate at said mine in connection with said railroad track, such switches and storage tracks as may be necessary for the accomodation of the business of mines of the coal company. The entire cost of constructing said railroad track with the switches, storage tracks and all instrumentalities necessary for its construction and operation shall be borne by the railroad company except that the cost of a bridge to be constructed for the purpose of carrying said railroad over and across the Raccoon river shall be divided equally between the parties hereto. The entire cost of constructing the grade upon said right of way ready to receive the ties and rails to be laid thereon by the railroad company as hereinbefore provided shall be borne by the coal company. When said coal company shall have mined and delivered to the railroad company for transportation over its said railroad fifty thousand (50,000) tons of coal produced from the mines of said coal company, the railroad company shall thereafter credit or remit to said coal company the sum of two dollars and a half ($2.50) per car upon each car of coal thereafter shipped over its railroad from the mines of said company until the entire cost of construction of said grade and the fifty percent (50%) of the cost of construction of said bridge, advanced by the coal company, shall have been refunded and returned to the coal company; the purpose being to reimburse said coal company for the expense of building said grade and bridge by such credit of two dollars and a half ($2.50) per car upon all coal carried in excess of fifty thousand (50,000) tons, it being understood that the railroad company shall not be liable for such reimbursement in any other manner than by such credit. The refund or credit of two dollars and a half ($2.50) per car shall not apply to any car loads of coal handled at switching rates. The necessary grading shall be done by said railroad company and the cost thereof shall be repaid to it by the coal company as the work progresses and the expense of construction is incurred. The coal company

shall proceed at once by condemnation or purchase to procure the necessary right of way for the construction of said track, and when it has procured good and sufficient legal title thereto, it shall convey the same to said railroad company by a deed sufficient to vest in said railroad company all right, title, and interest therein acquired by the coal company by such condemnation or purchase. The railroad company shall bear the entire cost and expense of construction, maintenance and operation of the track hereinbefore referred to, including the switches, spur tracks and all instrumentalities provided for use in connection therewith.

Pursuant to this agreement, the railway built a track over plaintiffs' land, and also onto and upon the land of one Chas. Davis, which adjoined plaintiff's land on the west. The railway track so constructed was used for the sole purpose of transporting coal from the shaft on the Chas. Davis land from the time of its construction down until the year 1910; and it is claimed that none of the parties to the original lease and none of the assignees thereof ever thought or understood that the right of way was other than a private one, created to facilitate the mining of coal from the plaintiffs' lands and those immediately adjacent thereto. It appears that in securing this right of way the original lessees represented that they wished it for the purpose of hauling coal from the shaft to a connection with a railway to the east of plaintiffs' land. The Iowa Portland Cement Company constructed a plant for the manufacture of cement, some time in the year 1909, upon some land southeast from that owned by plaintiffs, and in that year began the construction of a switch running east from and connecting with the coal road on plaintiffs' land, and in the following year completed the same, so that it had a track leading from its works over the switch constructed by the railway to a junction with a railway owned by one of the defendants. This switch or track was constructed by the cement company under a contract with the Des Moines & Ft. Dodge Railroad Company, from which we extract the following:

Whereas, the railroad company owns and operates a spur track from Valley Junction, Iowa, to the coal mines of the Hollingsworth Coal Company, a short distance from Valley Junction, Iowa, and from the main line of the road of the railroad company; and whereas, the cement company owns real estate located near said spur track and is erecting thereon a plant for the manufacture of Portland Cement and desires to connect its said plant with the main line of said railroad company's railroad at Valley Junction by a spur track to the Hollingsworth Coal Company's said mine, so that cars can be moved to and from its said plant and the railroad company's main track and its connections; and whereas, the cement company has arranged with the Chicago, Rock Island & Pacific Railway Co., for the transportation of rock and shale for the use of its manufacturing plant, and has agreed with the said Chicago, Rock Island & Pacific Railway Company to provide at its own sole cost and expense spur or switch tracks connecting the cement plant at Des Moines with the lines of the Chicago, Rock Island & Pacific Railway Co., and allow the Chicago, Rock Island & Pacific Railway Co. to have the free use of said spur or switch tracks in connection with the business of the cement company: It is therefore mutually agreed:

First. That the cement company shall locate, construct and maintain a single spur track from its said property and trackage thereon to connect with the said Hollingsworth spur track at the point indicated on the blue print attached hereto and made a part hereof, which connection shall be made under the supervision of the chief engineer of the railroad company and in the manner prescribed by the railroad company, and shall maintain said connecting spur track and all tracks located upon its property. The railroad company will maintain, and renew when necessary, all of said connecting track constructed upon its right of way, and will furnish all labor and material, including track, ties, rails and fastenings, switch ties, switch points and fixtures, frogs and guard rails, foot blocking, switch stands and connecting rods, and the cement company agrees to pay the entire cost within thirty days after the receipt of a bill covering such maintenance and renewal of said connecting track.

Second. The railroad company may use the tracks of

the cement company to reach other industries which may be located on the tracks of the cement company or extensions thereof, but such use must be in a manner that will not interfere with the proper and expeditious switching of the cement company.

Third. In order that the cement company may fulfill its obligation to the Chicago, Rock Island & Pacific Railway Co. in providing the switch or spur connection as above set forth, without the necessity for constructing any railroad between Valley Junction and its manufacturing plant, it is agreed between the parties hereto that the railroad company will permit the Chicago, Rock Island & Pacific Railway Co. to use its said track between Valley Junction and the track serving the factory of the cement company in such manner as to make full compliance on the part of the cement company with its agreement, as above set forth, with the Chicago, Rock Island & Pacific Railway Co. under regulations fixed by the railroad company.

Fourth. In consideration of this concession by the railroad company the cement company agrees to pay to it in monthly installments a rental of two thousand five hundred dollars ($2,500) per annum, and a proportion of the maintenance charge based upon wheelage. The business handled by or for the Chicago, Rock Island & Pacific Railway Co. will be one of the wheelage items, and the business handled by the railroad company for itself or others will be the other factor, the railroad company having the exclusive right to use its track for switching, aside from the accommodation to be provided for the Chicago, Rock Island & Pacific Railway Co. as hereinbefore recited.

Fifth. If additions or betterments are made to the property of the railroad company on account of the use of said spur track, the actual cost of such betterments shall be certified to the cement company and the rental charge will be increased at the rate of five percent per annum on such expenditures.

Eight. That portion of this contract which refers to the use of the railroad company's track by the Chicago, Rock Island & Pacific Railway Co. and the obligations of the cement company on that account, shall remain in force five years from this date, and thereafter until terminated by six months' written notice given by either party hereto to the other; provided, however, that the railroad company

may terminate this contract at any time within five years from the date of this agreement, by giving to the cement company eight months' written notice, on payment to the cement company of five thousand dollars ($5,000.00). It is further provided that the cement company may at the same time or at a later date on six months' written notice withdraw from the railroad company the privileges granted in connection with reaching other industries recited in the second paragraph hereof.

Should the cement company refuse to pay any bill for rental upon presentation, cease to operate its plant and said trackage for a period of six months, or refuse to pay bills for maintenance or renewal as hereinbefore provided, said connecting track may be removed by said railroad company, should it desire so to do, without damage or right of costs accruing to said cement company, notwithstanding anything to the contrary hereinbefore provided.

The following plat will indicate the location of the tracks and rights of way:

The cement company was the owner of all of the right of way used for the cement track, except that part on plaintiffs' land as indicated by this plat. Before constructing its switch, the cement company endeavored to arrange with plaintiffs for the purchase of the necessary lands to reach the coal track, but was unable to do so, and the Des Moines & Ft. Dodge Railroad Company then resorted to condemnation proceedings, secured an award from a sheriff's jury, paid the amount of the award to the sheriff, and the track was constructed thereon under the contract made with the cement company. No appeal was ever taken by plaintiffs from these condemnation proceedings. All of the track, save the part shown on the plat as lying upon plaintiffs' lands, is upon property owned by the cement company. Plaintiffs protested against the condemnation proceedings and now claim that no right of condemnation existed, for the reason that it was for the sole benefit of the cement company; that the railway company had but a nominal interest, and simply permitted the use of its name in the proceedings; and that the use for which the land was condemned was private, and not public.

It was the intention of the defendant railroad companies and the cement company to use the original coal track for the purpose of conveying freight over it to the cement track, and, after this suit was brought and prior to the trial, it was so used, and car loads of rock and other material, for the use of the cement company, were carried over said tracts. It is claimed that numerous car loads of such materials were almost continuously left standing on the coal track, and were backed up and left standing on that track west of its junction with the cement track, making it inconvenient for plaintiffs to get from their house on the south side of the coal track to the land on the other side of that track; that the trains running on the track for the use of the cement plant frightened plaintiffs' stock; and that the cement switch cut off plaintiffs' access to that

small part of land northeast of the switch. It appears, without dispute, that the cement company brings in over this railway about one thousand tons of stone per day, and also large quantities of shale, gypsum, and other materials, and that its product is shipped out over the same line, reaching all of the defendant railway companies. A village of some six or seven hundred people has grown up around the cement plant. After the commencement of this action, the cement company put in a passenger service for the use of its employees, and from the testimony with reference thereto we quote:

We have passenger service each day between the cement plant and Valley Junction. Six trains a day each way. Some of our operatives live in Valley Junction and some in Des Moines. They pay fare. Some of the children of the employees go to school at Valley Junction, and use this passenger service morning and evening. They pay passenger fare. The freight traffic is confined entirely to the operation of the Rock Island Railway over the spur for freight traffic. We are not operating over the spur ourselves anything but passenger service. The use we have of it, by means of the arrangement with the Rock Island company, is they bring in all our raw material over that line and take out the finished product that is marketed on their lines or connecting lines. . . . The distance from our plant to Valley Junction is about a mile and three-fourths. To go around by Des Moines, it would be ten miles. The passenger trains I have referred to are handled by the cement company themselves. They were just inaugurated for the purpose of accommodating employees of the cement company, bringing them back and forth to their work. Some of the school children take advantage of the passenger trains incidentally. A great many of the miners use these trains. Any one can ride who pays fare. . . . Our employees who ride on these passenger trains buy tickets which cost them $3\frac{1}{2}$ or 3 1-3 cents for the trip one way, and tickets are sold to others at a fraction less than 5 cents, where they buy ten tickets for one way. The regular fare for one way is 5 cents.

The estoppel relied upon by the defendants is the building of the track and the large expenditures made in constructing the cement plant, all with plaintiff's alleged knowledge and acquiescence. There is very little, if any, dispute over the facts, and the questions presented are largely of law.

I. The first proposition which we shall consider is the legality of the condemnation proceedings or rather the right of the plaintiffs to attack the same, in view of the fact that they did not appeal from the award of the sheriff's jury. For the purpose of the case, we shall assume that the use for which the property was condemned now appears to be a private one; that is to say, a mere switch track to reach the cement track, and latterly to take care of and transport the employees of the cement company. There are conflicting decisions upon the question as to whether or not such use is public; but, in our view of the matter, it is unnecessary to decide the proposition. This is an independent action in equity to enjoin the use of the tracks, and the attack upon the condemnation proceedings is collateral, in the sense that no appeal was taken therefrom to the district court, as the plaintiffs might have done under the provisions of our statute with reference to *ad quod damnum* proceedings. If the questions now raised might have been presented upon such an appeal, then, of course, an action in equity will not lie; for plaintiffs had a plain, speedy, and adequate remedy at law. There is no claim that the condemnation proceedings were fraudulent, or that any facts were fraudulently withheld from the plaintiffs until after the time for an appeal had expired. They simply say that the use for which the land was condemned was a private one, and that if the statutes authorize condemnation for any such use they are unconstitutional. This latter is not their exact claim; it is that, as applied to the facts hereinbefore recited, the proceedings were and are unconstitutional. Of

1. EMINENT DOMAIN: private use of property: injunction: collateral attack.

course, proceedings can not be unconstitutional in this broad
sense.   The condemnation was not under statutes authoriz-
ing condemnation for private purposes, but public ones.
This condemnation was in the name of a railway company,
which was authorized to condemn for public purposes, and
whether or not it was in fact seeking to condemn for a
public, rather than a private, purpose was a question of
fact, pure and simple, which might have been raised and de-
cided in the district court upon appeal.    Whatever the
intimations in previous cases, the right to test such a ques-
tion by a suit in equity is foreclosed in this jurisdiction by
*Laplant v. City of Marshalltown,* 134 Iowa, 261; *Waterloo
Co. v. Hoxie,* 89 Iowa, 317; *Keokuk R. R. v. Donnell,* 77
Iowa, 221, and other like cases.    Intimations to the con-
trary in *Forbes v. Delashmutt,* 68 Iowa, 164, are disposed
of in the cases hitherto cited.    The holding in these cases
is that an action in equity will not lie; and this is the rule
which generally obtains.   See High on Injunctions (3d Ed.)
section 644, and cases cited; Lewis on Eminent Domain
(1st Ed.) section 646.    We reach the satisfactory conclu-
sion that plaintiffs are not entitled to question the con-
demnation proceedings in this action; and the decree as to
that part of the railway is correct.

II.    The next question is; Have the defendants a
right to use the entire spur track under the lease originally
granted by plaintiffs to Simpson and Reynolds?

As to this, we are quite as well satisfied as upon the
other proposition; but our conclusion here is adverse to the
claims made for defendants.    None of the defendants
have any greater rights under the lease than
the original lessors, Simpson and Reynolds,
would have had, save, perhaps, for reasons
which we shall presently consider.    To properly construe
this lease, regard should be had of the circumstances under
which it was executed; for these throw light upon the pur-
poses of the parties thereto.    It will be noticed that the lease

2. Same: right of way: unauthorized use: evidence.

was not to a railway corporation, but to private parties; and these parties were either coal operators or prospectors, who had no other use for the right of way over the land than to secure an outlet for the coal which they were leasing. There was no town near at hand, nor any industries in the vicinity, either in existence or in contemplation of the parties. When the switch was constructed, it was built to the shaft, which was sunk for mining purposes. The right of way was limited, also, to the term of the lease, or to the life of the coal which was to be mined. It was not proposed to use the line for the carriage of passengers, nor to handle freights for the public in general; and we are satisfied from the testimony that there never was any thought on the part of the original lessees that the track would ever be used for anything, except the hauling of coal from the mines then in existence or such as should be developed in that immediate vicinity in the future.

It is true that the lease does not specifically state what the track constructed upon the right of way therein granted was to be used for; but the oral testimony makes this plain, and this testimony was admissible under familiar rules. *Thomas v. Wiggers,* 41 Ill. 470; *Landt v. Schneider,* 31 Mont. 15 (77 Pac. 307); *N. O. R. R. v. Darms,* 39 La. Ann. 766 (2 South. 230); *Sargent v. Adams,* 3 Gray (Mass.) 72 (63 Am. Dec. 718); *Bartels v. Brain,* 13 Utah, 162 (44 Pac. 715). This lease did not, in our opinion, authorize the defendants, or any of them to convert the right of way and track therein provided for into a public railway, or authorize them to convert it into a line for the transportation of freight and passengers in general.

Defendants' plea of estoppel is not sustained by the testimony. True, plaintiffs saw the building of the cement plant; but they also knew that there were two railways near 3. Same: estop-    at hand, one of which was already connected pel.    by switch with the cement plant. When the railway company proposed to condemn the land, in order to

have a connection with the coal road, plaintiffs personally and through their attorneys objected thereto, and at the same time stated that they did not think defendant's had the right to use the spur track then in existence for any other purpose than the hauling of coal. The carriage of passengers was not commenced until after this suit was brought, and at all times plaintiffs have objected to such use of the track. Under the circumstances, plaintiffs did not lose their rights by estoppel. They could not object to the presence of the spur track, and they did not estop themselves by delay in the prosecution of this action. These views find partial support, at least, in *St. Joseph R. R. v. Callender,* 13 Kan. 496; *Crosby v. Dracut,* 109 Mass. 206; *Hooper v. Columbus R. R.,* 78 Ala. 213.

In *Stretton v. Great Western & B. R. R.,* 40 L. J. Eq. 50, the court said: "With regard to what is said as to public interests, I am not inclined to listen to any suggestions of public interest as against private rights acquired in a lawful way. I do not think that the interest of the public in using something that is provided for their convenience is to be upheld at the price of saying that a person's property is to be confiscated for that purpose. A man who comes to this court is entitled to have his rights ascertained and declared, however inconvenient it may be to third persons to whom it may be a convenience to have the use of his property."

Our conclusion on the whole case is that the trial court was right in dismissing plaintiffs' petition in so far as it related to the right of way secured by condemnation, but wrong in holding that the defendants, or any of them, had the right to use the spur track constructed under the lease for anything more than the hauling or mining of coal and the uses reasonably incident thereto.

The result is that the decree must be affirmed in part and reversed in part, and the cause is remanded for one in

harmony with this opinion.   Each party will pay one-half of the costs of the appeal.

*Affirmed* in part, and *reversed* in part.