JOHN CONNOLLY, III, et al., appellees, v. DES MOINES AND CENTRAL IOWA RAILWAY COMPANY, appellant, and CITY OF DES MOINES, intervenor-appellee-appellant.

No. 48429.

(Reported in 68 N.W.2d 320)

February 8, 1955.

Rehearing Denied April 8, 1955.

c

Bannister, Carpenter, Ahlers & Cooney, of Des Moines, for appellant.

Emmert, James, Lindgren & Eller and Connolly, O'Malley & McNutt, all of Des Moines, for appellees.

Harold Newcomb and John A. Blanchard, both of Des Moines, for intervenor-appellee-appellant.

MULRONEY, J.—Plaintiffs sought to enjoin the defendant's condemnation of a railroad right of way and the City of Des Moines intervened. All parties appeal from portions of the trial court's decree. We will state the facts as we present the issues between the parties.

About a half century ago an electric trolley railroad, then called the Inter-Urban Railway Company, which ran into Des Moines, decided to construct a branch from its Beaver Valley substation west and north to the town of Urbandale. The right of way for this branch line was acquired by conveyances or condemnation proceedings and the construction was completed in 1906. On December 20, 1906, the Inter-Urban Railway Company transferred this right of way to the Des Moines City Railway Company, taking back a contract with the latter to use the tracks and right of way for freight. The result of this conveyance and contract was that the Des Moines City Railway Company and its successors maintained the passenger service over the branch line and the Inter-Urban Railway Company and its successors maintained the freight service over the line. There were successor companies for both of these railroads, due to name changes and bankruptcy proceedings, and it is enough to state that after July 1929 the successor to the Des Moines City Railway was the Des Moines Railway Company and after June of 1949 the successor to the Inter-Urban Railway Company was the Des Moines and Central Iowa Railway Company, the defendant in this action.

This branch line started at the Beaver Valley Substation near Twentieth Street on Harding Road and it goes almost due west to Thirtieth Street. From there on there are curves to the south and north as it proceeds west across Thirty-fourth Street or Leado Avenue, Thirty-eighth Street, Beaver Avenue or Forty-first Street, Forty-fourth Street and Forty-ninth Street and thence west to the city limits and north to Urbandale. It will do no harm to the issues on appeal if we ignore the curves and street names, and probably make for clarity, if we picture a branch line extending west from Twentieth Street across numbered cross streets to the city limits or Sixty-third Street, thence northwest to Urbandale. Only portions of the right of way in the city are now involved.

The freight and passenger service over this branch line was operated by the two original companies or their successors until about 1942 when freight service west of Forty-fourth Street was discontinued, and early in 1950 passenger service west of Forty-ninth Street to the town of Urbandale was terminated, and the rails removed from that portion of the right of way. On August 29, 1947, the Des Moines Railway Company gave one Salzberg an option to purchase the track, trolley and right of way of this branch line, exercisable within thirty days after optionor ceased to operate passenger cars on the line. This option was recorded October 25, 1947. At that time Mr. Salzberg was the principal bondholder of defendant's antecedent company, then emerging from reorganization. When that company was reorganized into defendant company, of which Salzberg is president, the latter assigned the option to defendant company July 5, 1949. It fairly appears that Salzberg took the option for the company and optionor so understood and in any event Salzberg joined personally with defendant in the notice and proceedings for exercise of the option.

On March 6, 1951, the Des Moines Railway Company ceased all passenger service and on April 2, 1951, defendant exercised its option. More will be said about the exercise of this option later but for the purpose of stating the issues between plaintiffs and defendant it is sufficient to state that defendant, by virtue of the exercise of this option, and the conveyance given pursuant

thereto, is now the owner of the title, possessed by the Des Moines Railway Company, in the segment of right of way involved.

As between plaintiffs and defendant the controversy is over the ownership of the first ten blocks of the right of way or from Twentieth to Thirtieth Street. This part of the right of way was originally acquired by deed from C. C. Nourse dated October 21, 1905, which contained a reverter clause providing for reversion of the right of way to Nourse, his heirs or assigns, in the event passenger service was discontinued, or the road was operated otherwise than therein stated. It is admitted plaintiffs now own such reversionary rights.

Because a controversy had arisen as to the reverter of title by virtue of the Nourse deed the defendant commenced condemnation proceedings of this first ten-block segment of the right of way from about Twentieth Street to Thirtieth Street. Notice of the condemnation proceedings was served on plaintiffs, which notice prescribed for viewing by the commissioners appointed by the sheriff on April 25, 1952. On April 17, 1952, plaintiffs filed their petition in this case seeking an injunction against the condemnation. Defendant answered admitting in effect that plaintiffs own any reversionary rights, if any exist, but contending they owned no interests which could not be adequately compensated for in the condemnation proceedings. There were other pleaded issues between plaintiffs and defendant which we will state later, but plaintiffs' whole case depends upon the correctness of the trial court's first ruling that they now owned the right of way, from which ruling defendant appeals.

The Nourse deed contained a number of clauses stating the right of way that is granted "is for the operation only of a suburban or interurban line of railway to be operated by electricity only, for the transportation of passengers and such freight as may be incidental to said business." It stated the conveyance was on condition that the railroad maintain certain stopping points and platforms for the purpose of taking on or discharging freight and passengers and it provided: "It is further provided that if at any time hereafter the inter-urban railway company or its assigns shall cease to operate said road, as herein contemplated, for six consecutive months, their rights

and privileges herein conveyed shall be forfeited and said right of way shall revert to said C. C. Nourse, his heirs or assigns, if he or they shall so elect."

As stated, the passenger service was discontinued in March 1951 and in the same year defendant put into use Diesel locomotives for all of its motor power. Plaintiffs acquired their title by conveyance from Laurance B. Nourse on February 21, 1952, and shortly before this conveyance Laurance B. Nourse caused written notice to be served on defendants demanding immediate possession of said strip of right of way.

I. Defendant first contends there was no such violation of the terms of the Nourse conveyance as to cause the right of way to revert. The argument is based on the evidence that the area is served now by passenger busses operating on streets, and the deed should be interpreted in the light of modern methods of passenger transportation. There is no merit in the argument. This strip of the right of way was never condemned. The parties in effect contracted that the right of way would revert in the event the electric railroad passenger service would be discontinued. They had a right to contract as they wished. If the original grantee did not like the terms pressed upon it by the owner, it could have condemned. It avoided condemnation by accepting something less than full rights and, theoretically at least, by paying something less than full compensation.

In Spencer v. Wabash Railroad Co., 132 Iowa 129, 132, 109 N.W. 453, 454, the deed by which a railroad acquired a right of way contained a condition that nonuser for a railroad would cause reversion to grantor. When the railroad was abandoned we held there was reversion to the original grantor, the opinion stating: "The land was not originally condemned for railway purposes. * * * It was perfectly competent for the parties to thus contract * * *. * * * the parties may contract as they will about rights of way, and when they have so contracted courts must give force and effect thereto."

See also article in 36 Iowa Code Annotated 89; Reichard v. Chicago, B. & Q. R. Co., 231 Iowa 563, 1 N.W.2d 721; Brugman v. Bloomer, 234 Iowa 813, 13 N.W.2d 313.

II. Defendant makes some argument that the decree

quieting title in the plaintiffs to the strip under condemnation was beyond the power of the equity court. The argument is that defendants' failure to comply with the conditions of the deed constitutes a breach of condition subsequent and equity will not enforce a forfeiture until the party entitled to take advantage of the breach has made re-entry or in some manner regained the estate. In the Reichard case, supra, page 570, we pointed out that a determinable or qualified fee is one that could end " 'on the happening of a merely possible event' " and there too we stated at page 571: "One must do much hair splitting to find any difference or distinction in the defeasible events which have been held, in the hundreds of cases where the question has arisen, to have terminated determinable fees, and fees upon condition subsequent."

In the Reichard case we went on to hold there were sufficient acts shown to comply with the demands of the law respecting re-entry if it be a condition subsequent, even though there was no actual re-entry. The facts are stronger in this case, for not only did plaintiffs' predecessor in title serve notice on defendants that they were in effect trespassers, but also defendant by starting condemnation, in effect recognized its rights had terminated. As we held in the Reichard case the evidence supports the reversioner's right to the property whether the deed created a terminable fee or a fee with condition subsequent.

III. After holding the plaintiffs owned the ten-block strip, the court went on to hold plaintiffs were not entitled to a decree enjoining defendant's condemnation proceedings. The plaintiffs appeal from this ruling arguing (1) the defendant's proposed use of the property would perpetuate a nuisance, and (2) the taking is not for a public use.

The trial court found the operation of the railway across the strip in question was not a nuisance. Plaintiffs introduced the testimony of abutting property owners several blocks west of Thirtieth Street who were disturbed by defendant's train operation. But the strip in question from Twentieth to Thirtieth Street is in a wooded area with no residences or dwellings or any structures fronting on the right of way. The right of way follows along a ravine with a creek on one side, and no adjacent

owners appeared as witnesses to complain of any noise or inconvenience.

While the nuisance issue can easily be decided on the record which is devoid of any proof of nuisance as to the first ten-block segment of right of way, we do not wish to intimate any condemnation for a railroad could be stopped on the theory that the railroad operation would constitute a nuisance. It would seem if that were true the power of eminent domain would be quite useless. Plaintiffs do not call our attention to any cases where condemnation proceedings were halted on such a theory.

IV. Section 471.6, Code, 1954, provides in part: "Any railway, incorporated under the laws of the United States or of any state thereof, may acquire by condemnation or otherwise so much real estate as may be necessary for the location, construction, and convenient use of its railway."

■ The question of the necessity of the taking for a public purpose cannot be raised in an independent suit to enjoin condemnation. When the government's power of eminent domain is delegated to municipalities, agencies and railroads, its exercise by the latter is the same as if the state is acting to condemn.

In Stark v. The Sioux City & Pacific R. Co., 43 Iowa 501, a suit to enjoin condemnation, decided when the law provided the right of way should not exceed one hundred feet in width, it was held that land within the limit fixed by the legislature for a right of way is "conclusively presumed" to be necessary.

In Davis v. Des Moines & Fort Dodge R. R., 155 Iowa 51, 62, 135 N.W. 356, 360, the opinion states: "This condemnation was in the name of a railway company, which was authorized to condemn for public purposes, and whether or not it was in fact seeking to condemn for a public, rather than a private, purpose was a question of fact, pure and simple, which might have been raised and decided in the district court upon appeal. Whatever the intimations in previous cases, the right to test such a question by a suit in equity is foreclosed in this jurisdiction by Laplant v. City of Marshalltown, 134 Iowa 261; Waterloo Co. v. Hoxie, 89 Iowa 317; Keokuk R. R. v. Donnell, 77 Iowa 221, and other like cases. Intimations to the contrary in Forbes v. Delashmutt, 68 Iowa 164, are disposed of in the cases hitherto

cited. The holding in these cases is that an action in equity will not lie; and this is the rule which generally obtains."

We quoted the above language with approval in Heinz v. Davenport, 230 Iowa 7, 12, 296 N. W. 783.

It is our conclusion as to the case between plaintiffs and defendant the trial court was right in holding the title to the ten-block strip was in plaintiffs and plaintiffs were not entitled to decree of injunction to stop the condemnation proceedings instituted by defendant.

V. On April 21, 1952, the City of Des Moines filed a petition for condemnation of the same property, the right of way from Twentieth to Thirtieth Street. Two days later the city filed its petition of intervention in this case in which it alleged the city council had approved a certain zoning plan which would include this strip in a parkway that was incorporated in the plan. The city alleged plaintiffs had title to the strip and it joined with plaintiffs' prayer that defendant's condemnation be permanently enjoined. The city also alleged the proposed use by defendant would be a nuisance and there were other allegations which we will state later. Defendant answered denying the material allegations of intervenor's petition and cross-petition against intervenor to permanently enjoin the latter's condemnation proceedings of the same strip. The trial court held for defendant, granting the defendant's prior right to condemn, as its condemnation proceeding was started first, and enjoined the city's condemnation proceedings. The intervenor appeals from this ruling. The city's argument on the issue of nuisance is no different than the plaintiffs' disposed of in an earlier division of this opinion.

VI. The argument of intervenor is as follows: the title to the strip is in plaintiffs and the strip is not now devoted to a public use by them, and there is no necessity for the taking of plaintiffs' land for the purpose of the railroad and where necessity is not shown for the taking of private property for public use, such condemnor does not acquire priority of right merely by filing its application first, as against another condemnor who has established the necessity of taking such property for a different public use.

■ The argument on the question of necessity for defendant's condemnation is the same as that advanced by plaintiff. We can assume the taking would be necessary for both condemnors. But the court can hardly decide who needs it most and make a priority award of condemnation on that basis. The City of Des Moines has no superior right of eminent domain over the right possessed by the defendant railroad.

■■ Property devoted to a public use cannot ordinarily be taken for another inconsistent public use and this rule "applies to property about to be lawfully appropriated, although the appropriation is not complete." 29 C. J. S., Eminent Domain, section 74, page 862. See also East Hartford Fire Dist. v. Glastonbury Power Co., 92 Conn. 217, 102 A. 592; Town of Alvord v. Great Northern R. Co., 179 Iowa 465, 161 N.W. 467. The intervenor recognizes the force of this rule but it argues this property was owned by plaintiffs and they had not devoted it to a public use and defendant had not acquired any right over the strip to devote it to a public use at the time the city sought to condemn. A realistic view of the evidence in this case certainly establishes the fact that the property was already devoted to a public use, to wit, a railroad right of way. We need not decide whether lack of legal sanction for such use would destroy its immunity from another condemnation. It is admitted the railroad condemnation proceedings were started first and that fact alone gives the railroad priority as condemnor over the city.

VII. It would seem the foregoing would decide the case. So far we have affirmed the rulings of the trial court holding that plaintiffs own the first ten blocks of right of way but defendant has the right to condemn it and intervenor's condemnation proceedings are to be permanently enjoined. But the pleadings as between defendant and the city went on to raise other issues tendered by intervenor as to the ownership of portions of the right of way lying west of Thirtieth Street. Defendant strenuously contends these issues were not involved in the case but intervenor contends they are because all of the shippers are west of Thirtieth Street and if defendant does not own that right of way it is clear the portion from Twentieth to Thirtieth Street would serve no public purpose. These issues are fully argued and since the trial court ruled on these issues we feel, in the interest

of ending the litigation, it would be best to decide them. To present them will require some additional facts.

In its pleadings the city asserted title to all of the right of way from near Thirty-fourth Street to Forty-fourth Street. Its claim of title to the right of way from Thirty-fourth Street to Thirty-eighth Street was based on a deed from the Des Moines Railway Company to the city, which was dated October 1, 1929. The deed is not a form instrument and it is without warranties and it recites the consideration will be the amount of any special assessment against the conveyed property for any improvement made within ten years from the date of the deed and "if no such street improvements are made on said premises, which Des Moines Railway Company, its successors, or assigns, are required to pay any part of, then the City of Des Moines shall not be required to pay anything for the conveyed premises."

The above deed was not accepted by the city until nearly twenty years later when the city on the 25th of August, 1949, passed a resolution finally accepting the deed. The deed was recorded September 26, 1949.

The city's claim of title to the right of way from Thirty-eighth Street to Forty-fourth (and on west to Sixty-third Street) is based on a quitclaim deed to it reciting $1.00 consideration, by the Des Moines Railway Company, grantor, dated February 16, 1950. This deed was accepted by the city February 23, 1950, and recorded February 25, 1950. It will be recalled the Des Moines Railway Company gave the option to purchase all of this right of way in August of 1947 which was recorded nearly two years before the city's first deed was accepted and over two years before the second deed was executed.

On August 5, 1949, the defendant company by its general manager wrote a letter to the president of the Des Moines Railway Company referring to other correspondence about the option to purchase the Urbandale line, the letter stating in part as follows:

"It appears that there are a number of shippers on that line who are entitled to service and we might not be able to abandon the line if we wish to, certainly not without the permission of the Iowa Commerce Commission * * *

"We, therefore, will exercise the option to purchase the right of way, steel and overhead on that line as contained in the said agreement.

"Please notify the writer when you will be ready to abandon the operation of street cars on the line and we will perform our part of the agreement."

It will be recalled this option was, by its terms, "to be effective whenever the Des Moines Railway ceases to operate" its passenger cars and was to be "exercised" by optionee giving written notice to the optionor of his intention to so exercise his option within thirty days after the cessation of the passenger service. Later when the passenger service was ended in 1951 the defendant did within thirty days give written notice of its intention to exercise the option, and, pursuant to the option plan for determining the sale price, it paid the Des Moines Railway $16,918 and received the conveyance of the right of way from the Des Moines Railway Company on July 14, 1951.

On August 19, 1949, the general manager of defendant railroad wrote a letter to the mayor and city council of Des Moines stating he understood they had been having some negotiations with the Des Moines Railway about the Urbandale line and the writer called to their attention that the defendant has for many years been operating a freight service serving the Beaverdale Community (at about Forty-first Street) and that it has an option to take over the rail and operating rights of the company in order to continue this service. The letter expresses the wish that no plans be made by the city looking to the removal of the railway tracks. The letter also states that the company has exercised the option. Three days later the mayor acknowledged the letter and it was just three days later that the city finally adopted the resolution accepting the 1929 deed to the Thirty-fourth to Thirty-eighth Street right of way. There is no evidence that the city, with full knowledge of the option, and actual notice by the optionee that the option would be exercised, ever communicated the fact it held these conveyances to the optionee. The trial court held the city owned the right of way from near Thirty-fourth Street to Forty-fourth Street, and defendant appeals.

The city admits it had notice, both constructive and actual, of defendant's option rights before it accepted the 1929 deed and before the 1950 deed was executed or accepted. It admits its conveyances were subject to the option agreement. Its sole contention is that the defendant did not exercise its option with the city. The city's contention is best stated in this quotation from the city's brief: "Defendant had its option to purchase the right of way from Leado Avenue (about 34th Street) to 44th Street and could have exercised it by having the same appraised in accordance with the option, and by tendering to the city the consideration for such property as thus determined and demanding a deed to the right of way. The city could have then been compelled to deliver title to said right of way to defendant upon defendant's exercising their option with the city and complying with the terms thereof. However the right to exercise the option with the city fully expired thirty days after the Des Moines Railway ceased its operations on Urbandale Avenue. Defendant-appellee paid the purchase money for the right of way * * * to the wrong party * * *. As the option cannot now be exercised with the city, the city cannot now be compelled or obligated to accept payment for this right of way. According to its terms the option is terminated and all rights thereunder have ceased to exist."

Defendant argues that the extent of the city's rights would be the right to have the $16,918 paid to it and in any event it did exercise the option exactly as the instrument provided by written notice to the optionor. There is no showing that defendant had actual notice of the city's conveyances. As previously stated they were recorded prior to the time defendant exercised the option and took the conveyance pursuant thereto, paying the optionor $16,918.

In Breen v. Mayne, 141 Iowa 399, 407, 118 N.W. 441, 444, we said: "The acceptance of the option, or the election when made, must be unqualified and unequivocal, *must be communicated to the party giving the option* in no uncertain manner, and be such that after it is exercised it becomes binding upon the party exercising it." (Italics supplied.)

The city's whole argument is that by virtue of its re-

corded conveyances, given after the option, it was substituted for the optionor and it should have been given the written notices of election to exercise the option. That is not what the option instrument provided and this option instrument was actually called to the city's attention before it accepted its conveyances. The option instrument provided for notice to the Des Moines Railway of its exercise. It provided for a determination of the price by an agreement between the two railroads and if they could not agree they were to agree on a realtor of Des Moines in good standing and if they could not agree on the selection of a realtor then they agreed that A. A. McLaughlin would select a realtor to determine the price and they would both be bound by his determination.

What are the rights and duties of the optionee and the grantee from the optionor before the exercise of the option? It can be admitted as a general rule that an optionor can convey subject to the option. So too as a general rule the optionee can assign his rights under the option contract. But the rule that the optionee can assign is subject to the limitation that there can be no assignment when the instrument fairly shows the option granted was intended to be personal. 66 C. J., Vendor and Purchaser, section 32; 4 Am. Jur., Assignments, section 17. The conveyance by the owner, subject to the option, amounts to an assignment of the owner's rights in the option contract, similar to the assignment of the optionee. It should be subject to the same limitation that it would not be effective when the option instrument shows it was intended to be personal. This option contract clearly shows it was intended to be personal between the parties, on such an important matter as the determination of the purchase price.

In any event, the rule is as stated in 66 C. J., Vendor and Purchaser, section 12, page 487: "The fact that the owner of land has given another a binding option to purchase the same does not deprive him of the right to convey subject to the option, but the purchaser of the land takes subject to the option and the holder of the option has such an interest in the land as will protect him against subsequent purchasers from the vendor with notice thereof."

To the same effect see 55 Am. Jur., Vendor and Pur-

chaser, section 36, and note in 50 A. L. R. 1314. It is true
that in some instances it has been held that an optionee does
not hold an interest in realty but as against the subsequent
vendee of the optionor, with notice of the option, the courts have
always held the optionee does have an interest in the realty that
will be protected if he exercises the option. The protection
afforded the optionee takes the form of decreeing specific per-
formance against the subsequent vendee or annulling his con-
veyance when the optionee has paid the consideration. See cases
collected in 50 A. L. R., page 1314; Crowley v. Byrne, 71 Wash.
444, 448, 129 P. 113, 114. In the last cited case the deed of the
intervening grantee, who had actual notice of a recorded option,
was annulled when the optionee exercised and paid the full con-
sideration to the optionor. When it was argued in the cited case
that "an option to purchase does not create an interest in the
land" the court held the unexpired option of which grantee had
knowledge became a fully executed contract when exercised,
vesting prior title in optionee as against the grantee of optionor.

The instant case is a much stronger case for the remedy
of annulling the city's conveyances rather than granting the
remedy of specific performance against the city. The early
English and American cases refused the remedy of specific per-
formance by optionee against optionor of option contracts calling
for determination of price by agreement or arbitration, mostly
because the courts could not see how a decree could be enforced.
Later some exceptions and limitations were made to this rule to
take care of inequities resulting from its application. See note
167 A. L. R. 727. But through all the cases there runs the
thought that such option contracts, where the price is to be de-
termined by the parties or arbitrators, are near the line of
specific unenforceability by the courts. This case would render
specific performance more difficult. The city argues the defend-
ant should have exercised its option with the city "and [de-
fendant] could have exercised it by having the same appraised
in accordance with the option, and by tendering to the city the
consideration for such property as thus determined and de-
manding a deed [from the city] to the right of way." We do not
know whether the city is arguing its conveyances would sub-
stitute it for the optionor railroad in the matter of agreement or

arbitration proceedings to determine the price. Surely the city could not gain the right to negotiate the purchase price the optionee was to pay by conveyances from the optionor. The alternative would be the original optionor would still have the duty to carry out these provisions for price determination—a duty which a court could hardly enforce. It merely points up the personal character of such a contract to say the optionor, who had conveyed his interest and would therefore be indifferent to the amount fixed, would still have a voice in fixing the price. One thing is certain under all of the authorities: the optionee is not to lose any of his rights under the option by the conveyance to one with knowledge of the option. 66 C. J., Vendor and Purchaser, section 12, supra.

VIII. There is no merit in the city's argument that notice of the exercise of the option should have been given to it. It knew all about the option and knew that defendant intended to exercise it when it became effective when the Des Moines Railway ceased passenger operation. The mere recording of its deeds did not charge the optionee with the duty to serve it with the notice of exercise of the option.

Intervenor in effect claims too much for the constructive notice the recording of its deeds imparts. There are persons who deal with realty in accordance with established rights, who are not required to keep themselves informed as to the status of the property by checking the records for instruments after their rights arose. Boehnke v. Roenfanz, 246 Iowa 240, 67 N. W.2d 585. The purpose of the recording act is "to notify subsequent purchasers and incumbrancers of the rights such instruments are intended to secure." Pels v. Stevens, 187 Iowa 443, 462, 173 N.W. 56, 63. The city admits it took its deeds subject to the prior recorded option agreement of which it had actual knowledge. There was no duty on the part of the optionee to investigate the records to see if the optionor made a subsequent transfer of the property. The optionee is in about the same situation as the vendee in a recorded contract for the sale of realty. "A vendee in an executory contract for the sale of land who has registered his contract * * * is not charged with notice from the record of a subsequent deed or mortgage executed

by his vendor." 45 Am. Jur., Records and Recording Laws, section 90. As previously pointed out the option is an interest in the land as against the subsequent purchaser from the optionor.

It may be conceded that ordinarily the grantee of the optionor "has stepped into the shoes of the grantor." Anthis v. Sandlin, 149 Okla. 126, 299 P. 458. But regard for equities and the law of assignments demands he actually notify optionee he is wearing them when he has actual knowledge of the option contract. In any event this goes merely to the question of his right to have the option price paid to him. To argue the giving of notice to the city of the exercise of the option, within thirty days after the Des Moines Railway ceased operation, at the risk of losing all option rights, is to argue the city would have some rights of substitution for optionor in fixing the price. The city does not argue that but it amounts to the same thing. The notice would be meaningless except to establish the city's right to ultimate payment. If the city is entitled to all or any part of the purchase price of $16,918 by virtue of its recorded conveyances and the notice they impart, it can assert its right in a proper action but it cannot assert its claim to priority of those conveyances taken with knowledge of, and subject to, the option, over the deed given pursuant to the option exercised according to its terms.

The equities of the case strongly favor defendant railroad. The record indicates there was no consideration for the conveyances to the city but we need not decide the issue. In any event the city was not an innocent purchaser. "One who purchases land from the owner, after the recording of the option given by the owner to another person to purchase the same land, takes with constructive notice of the option, and cannot claim to be an innocent purchaser." Guerin v. Sunburst Oil & Gas Co., 68 Mont. 365, 370, 218 P. 949, 951. When the city took its conveyances with full actual knowledge of the recorded option it took them with knowledge that they would be junior to any conveyance that would be made pursuant to the option agreement if the optionee elected to exercise. Its attention was called to the option agreement right after it passed its preliminary resolution accepting the 1929 deed. It remained silent and a few days later passed its final resolution accepting the deed. It placed

its conveyance on record and shortly thereafter took another conveyance. This was property defendant was occupying but the city did not communicate its interest to defendant. It asserted nothing for its deeds until this case was started. Here we have a railroad over which trains passed daily for forty-six years, operated by defendant and its predecessors in title. Defendant and its predecessors had paid for it and improved it. The city had no equity in this right of way. The city was told of defendant's option and of defendant's intention to exercise the option when the time came, before it accepted its conveyances. The city remained silent, took its conveyances and recorded them. It stood to win if the option was not exercised. Since it was exercised, exactly in the manner the option instrument provides, we think equity demands that the conveyance made pursuant to the option instrument be decreed superior to the city's conveyances. We make no determination as to any rights the city would have for any part of the determined price of $16,918. Part of that price represents rails and wire and other property in which the city had no interest under any theory of the case. Our decision is without prejudice to the city's right to assert its claim for all or a part of the purchase price against anyone. But we hold the defendant is entitled to decree adjudicating its title to the strip from Thirty-fourth Street to Forty-fourth Street is superior to the claim of the City of Des Moines based upon the 1929 and 1950 deeds from the Des Moines Railway.

This portion of the trial court's decree is reversed and remanded for decree in conformity with this opinion. In all other respects the decree of the trial court is affirmed.—Affirmed in part and reversed in part.

All JUSTICES concur.