HUNTER INVESTMENT, INC., appellee, v. DIVINE ENGINEERING, INC., appellant.

No. 49156.

(Reported in 83 N.W.2d 921)

1110

JUNE 26, 1957.

John D. Randall, of Cedar Rapids, for appellant.

W. W. Crissman, of Cedar Rapids, for appellee.

WENNERSTRUM, J.—Plaintiff-corporation seeks to quiet title in it to certain real estate in Cedar Rapids, Iowa. A question has arisen whether the defendant-corporation had exercised an option which had been incorporated in a lease covering the property. The defendant filed a cross-petition wherein it sought specific performance of the option agreement. The trial court found for the plaintiff and quieted the title in it. The defendant has appealed.

The lease had been entered into by Wathan-Hunter, Inc., the plaintiff's predecessor in interest, and the Divine Engineering, Inc., for a period of sixty months from and after May 1, 1952. The lease provided for rent of $375 per month for the first twelve months and $475 per month thereafter. Incorporated in the lease agreement is the following:

"The party of the second part is hereby granted the option to purchase at any time during the first twenty-four (24) months of this lease the above described property for the sum of $46,-000.00 plus interest at four per cent per annum from May 1, 1952, also, insurance and taxes from May 1, 1952. If the option is exercised, all rentals paid to the date of the exercise of the option are to be applied on the purchase price."

There is also incorporated in this lease agreement a statement which has some bearing on some of the facts, which will be later discussed, as follows:

"Party of the first part is to take care of the roof and all exterior repairs. Party of the second part is to take care of all interior repairs. Sale subject to lease with option to remove from premises in case of sale."

In the light of our later reference to certain testimony it should be kept in mind the option had to be exercised prior to May 1, 1954.

The defendant, pursuant to the lease agreement, has remained in possession of the premises from May 1, 1952, and has made the monthly payments as provided for in the lease up to and including the time this cause was submitted to the trial court.

Undoubtedly the main reason for this litigation is the fact that plaintiff on June 22, 1955, entered into an agreement with the city of Cedar Rapids for the sale to that municipality of the property here involved and some additional property at a price of $80,000. The record does not disclose whether there was an increase in the valuation of the property leased and claimed under the option agreement. Apparently the representatives of the city had some information of a possible claim on the part of the defendant-company inasmuch as there was incorporated in the purchase and sales agreement between the plaintiff and the city of Cedar Rapids the following provision:

"The seller agrees to furnish to the City written proof from Divine Engineering, Inc. and the Seller, to the effect that Divine Engineering, Inc. is in possession of the leased premises solely under the terms of the lease referred to above, dated April 7, 1952, and that Divine Engineering, Inc. claims no rights or equities other than those set forth in said lease, and further that no option to purchase said leased premises has been exercised by Divine Engineering, Inc. or by any other person, firm or corporation, nor is any option to purchase in existence at this time."

There is a complete lack of agreement in the testimony concerning the action taken by the respective parties relative to the exercising of the claimed option. By reason of this fact we are setting forth in as limited detail as possible the testimony of the important witnesses inasmuch as their statements are of vital import in our determination of this appeal.

Daniel Hunter, Sr., an officer of the plaintiff-corporation, testified that prior to January 1, 1954, he had a telephone conversation with either Mr. Howard E. Divine or Mr. Walter F. Heaton of the Divine Engineering, Inc., and states he may have talked with both of them. He further testified he asked them if they were going to exercise their option, and, if so, how long a time before the termination of it they would do so; that the men connected with the engineering company informed him they

were just a young company, they had not built up a reserve, they would have to borrow the money and wanted to know if he knew of anyone who would lend them the money; that prior to May 1, 1954, he had another conversation with either Mr. Divine or Mr. Heaton which was in person or by telephone, and in this second conversation he was informed they would not have the money to finance or pay the whole amount and wanted to know if the Hunter Investment Company would lend them the money they could not raise. Mr. Hunter also stated that after this second conference and before May 1, 1954, he did not remember talking with them regarding the option provision of the lease; he did not visit with them again concerning the option agreement until after he had sold the building here involved to the city; at that time he asked them to sign a paper and left it, inasmuch as Mr. Heaton remarked Mr. Divine would have to sign the instrument and he was not in Cedar Rapids; that later, and in July of 1955, Hunter called and talked with Mr. Divine and was informed he (Divine) would like to have his attorney see the paper which the city solicitor desired to have signed. It is also testified to by Mr. Hunter that prior to May 1, 1954, no inquiry was made of him by either Mr. Divine or Mr. Heaton with respect to the abstract of title to the premises and since that time neither Mr. Divine nor Mr. Heaton had made any request for an opportunity to have it examined; since May 1, 1954, the taxes had been paid by the Hunter Investment Company and after that date it had paid for the fire and extended coverage insurance on the premises involved in this controversy.

On cross-examination Mr. Hunter testified the lease and option agreement were prepared by a representative of a real-estate agency in Cedar Rapids and during the later talks with Mr. Heaton and Mr. Divine they did not say they were going to exercise the option but they did say they were working on the financing of a possible purchase.

C. W. Garberson, a witness for the plaintiff, testified he is the city solicitor of the city of Cedar Rapids and in connection with the purchase of the property here involved by the city he sought to obtain a written statement from the Divine Engineering, Inc., to the effect it did not claim any interest in the property by reason of the option; and that he and other representa-

tives of the city called at the office of the engineering company and there had a conversation with Mr. Heaton. His testimony is, in part, as follows:

"I asked him (Mr. Heaton) then if Divine Engineering, Inc., claimed to have exercised the option appearing in the lease agreement. Mr. Heaton informed me unequivocally that they had not exercised the option agreement and that statement by Mr. Heaton in the course of our conversation was repeated at least two more times, and Mr. Heaton went on to explain that the quarters were not large enough for their operation, * * *. I believe Mr. Heaton—I know Mr. Heaton added that they were seeking larger quarters for their growing operation."

Stuart Shank, Commissioner of Finance for the city of Cedar Rapids, and George Lee, Superintendent of the City Water Department, gave testimony which was substantially the same as that given by Mr. Garberson.

Howard E. Divine, president and secretary of the defendant-corporation, testified he and Walter Heaton had a conversation with Daniel Hunter, Sr., in the engineering company's office in February 1954. The record concerning this conversation is as follows:

"Q. And will you now tell the court what was said and what was done at that time, Mr. Divine?
"A. Walter Heaton said to Mr. Hunter, 'Mr. Hunter, we are going to exercise the option and we want to go into with you the amount that we have paid, that is out of the rent that we have already paid towards the purchase of the building.'
"Q. And what did Mr. Hunter say?
"A. He said, 'Well, I would be crazy to do that,' and he walked out."

Mr. Divine further testified he did not personally talk with Mr. Hunter again up to May 1, 1954; that later he did have a telephone conversation with him and was told he (Hunter) had brought a paper to the office and he (Divine) asked, "What is it about?" and Mr. Hunter said, "It is a paper to show that you have no interest in these premises except the lease." The witness testified he then said, "Dan I am not signing anything without

going over it with our lawyer, or anything else." On cross-examination the witness stated that Mr. Dan Hunter came to the engineering company's office in February of 1954 and he had not talked with him before relative to the option provisions in the lease. He also testified:

"We never asked Dan Hunter to loan us one cent of money and we would never seek a loan from Dan Hunter. We did not ask Mr. Hunter in substance if he would be willing to carry the Divine Engineering for any balance of the purchase price that the Divine Engineering could not finance. In substance, all that either Mr. Heaton or I said to Dan Hunter on that occasion was that 'we are going to exercise the option and we want to go over with you the amount we have already paid on the building.' We knew what we had already paid on the building. We knew that we had not paid any more than the rent at that time. We wanted to go over the difference between what we had paid and the insurance and the other items which would be deductible and the balance would be paid toward the purchase of the building. We told Mr. Hunter that. I mentioned about the taxes and insurance in direct examination. I believe I said in direct examination that in the contract that anything over taxes and insurance and repairs to the building was to apply to the purchase of the building.

"Q. Didn't you say that Mr. Heaton told Mr. Hunter in substance that you wanted to go over with him the amount that had already been paid on the building, and that when Mr. Heaton said that Mr. Hunter said he would be crazy to do that and walked out, isn't that the way you told it?

"A. Mr. Hunter said that he would not—the thing that we would have would be the difference and Mr. Hunter said if he were to permit us to pay that difference on the purchase of the building that he would be crazy."

Mr. Divine also testified: "I did not write him any letters concerning the option provision in the lease, Exhibit 1. At no time did I or Mr. Heaton, to my knowledge, on behalf of Divine Engineering, Inc. before May 1, 1954, write to Mr. Hunter or to Wathan-Hunter, Inc. or Hunter Investment, Inc. to the effect that Divine Engineering was exercising the option provision in

the lease. It was not our purpose in going to the Merchants National Bank to find out how much could be borrowed by Divine Engineering on the security of this property. We wanted to have a check on the value of the building, because we knew that the purchase price was very high compared with the value of the building. * * * I believe the appraisal was made before May 1, 1954, I'm not sure. The Merchants National Bank, Mr. Smith or Mr. Coquillette of that bank, advised us that the property could be replaced at that time for about $35,000. * * * After we were advised of that, we made no effort to get in touch with Mr. Hunter before May 1, 1954, in respect to the option provision in the lease. I did not personally, no, sir."

He also stated prior to May 1, 1954, no request had been made of Dan Hunter or the Hunter Investment Company to submit an abstract of title to the premises; since May 1, 1952, and up to the time of the trial the Divine Engineering, Inc. had paid the rental payment provided in the lease, and that he did not remember whether the engineering company kept any minutes of a Board of Directors meeting they had prior to their conversation with Mr. Hunter in February of 1954. He further testified he did not cause any endorsement to be made on the policies of fire and extended coverage on the property so as to show any interest the Divine Engineering, Inc. might have as a contract purchaser, because if they endeavored to force the contract it meant a lawsuit. He also stated that prior to the execution of the lease neither the real-estate agent nor Mr. Hunter or anyone else ever brought up the question of a lump sum payment in the event the engineering company exercised the option. Mr. Divine also testified relative to the original lease agreement, in part, as follows: "* * *, if we would pay $475 a month, he would permit all above the cost of taxes and interest and insurance and repairs on the building, and that type of things to be applied to the purchase of the building, * * * 'I know you boys are going to really make it,' and he said, 'the more you pay the faster you will own this building.'"

Walter Heaton, an associate of Mr. Divine, stated in his testimony relative to the original lease and option agreement: "A. We were to pay for it as rent, $375 for the first year, $475

for the the second, less taxes and interest and upkeep which was to be deducted from the amount paid in terms of rent."

This witness stated relative to the claimed exercise of the option as follows: "I recall sometime in February of 1954, when Mr. Hunter came to the office of Divine Engineering, Inc. * * *. After Mr. Divine got to the office, I told Mr. Divine that Mr. Hunter and I had been talking. We wanted to exercise the option and we wanted to know how much we had paid in as rent, what the taxes were and what was to be deducted and allowed on the purchase price of this building. Mr. Hunter said he could not do that, he would be nuts to do that and got up and walked out. He said he would be crazy to allow the rent that we had paid for the first year and up to that time to apply on the purchase price of the building. Then Mr. Hunter left the office * * *."

He also testified that the previous relationships between Mr. Divine and himself and Mr. Hunter had not been satisfactory and because of that fact he did not write to him or the Hunter Investment Company any letter confirming what had been said in their conversation of February 1954 relative to the exercise of the option or make any request that an abstract of title be furnished them:

"Since February of 1954, neither Mr. Divine or I on behalf of Divine Engineering have secured a policy of fire and extended coverage insurance on the building in which the Divine Engineering, Inc. is the insured nor any endorsement of any existing policy showing any interest or [of] Divine Engineering, Inc. in that building. * * *

"Since May 1, 1954, Divine Engineering has been looking for other sites. We have looked for other sites and looked for other land, everybody does that speculative or otherwise. The present place was adequate to handle our operations. We were looking toward the future. We knew in the foreseeable future we would need additional space for our operations.

"I don't believe that we have been looking to find a place which would be adequate for our future operations since May 1, 1954, * * *. Sometime since that date we have been looking for other building sites. Our bookkeeper has charge of preparing

and sending the rent checks to Mr. Hunter. Mr. Divine and I sign all of the checks. All of the checks from the Divine Engineering to the Hunter Investment, Inc. or Wathan-Hunter, Inc. have been signed by both Mr. Divine and I. On none of the checks during the first year for $375 and thereafter for $475 each was there any notation on them other than a notation of rent. Mr. Divine and I filed a State and Federal income tax return for Divine Engineering, Inc. and I have examined it. The sum of $375 each month for the period of May 1, 1952 to May 1, 1953 and the sum of $475 thereafter have been taken as rental deductions for Divine Engineering on our State and Federal income tax returns."

And on redirect examination the following record is shown: "Q. Now, Mr. Heaton, Mr. Crissman asked you whether or not you had told any of the employees of the City Water Works that you had exercised the option and you answered no, I will now ask you if you told any of the employees of the City of Cedar Rapids that you had exercised the option? A. I told them that we did exercise the option."

In rebuttal testimony Mr. Hunter modified his prior statements to a degree and stated after hearing the testimony of Mr. Divine and Mr. Heaton he was satisfied he did confer with these two men in their office subsequent to January 1, 1954. He stated that Mr. Heaton explained to him the engineering company could not raise all this money and could only borrow part of it and inquired if Mr. Hunter would assist them either by contract or monthly payments or a second mortgage. Mr. Hunter testified that he informed them he had tax debts, had borrowed money, and that he wanted his money in cash. He further stated that when Mr. Divine came in he (Divine) inquired if they exercised the option if he, Hunter, would help them and that he then stated that he could not.

 I. The initial and essential matter for our determination is whether the lessee had exercised the option to purchase. The acceptance of an option, in order to be effectual, must be unequivocal and positive. 91 C. J. S., Vendor and Purchaser, section 10, page 853.

In Breen v. Mayne, 141 Iowa 399, 407, 118 N.W. 441, 444, this court set forth the effective basis by which an option must be shown to be exercised where it stated: "It will not do to establish a rule in these cases which will allow an optionee to 'play fast and loose' as interest may dictate. The acceptance of the option, or the election when made, must be unqualified and unequivocal, must be communicated to the party giving the option in no uncertain manner, and be such that after it is exercised it becomes binding upon the party exercising it. That is to say, it must assume the form of a contract proper as distinguished from a mere option or offer."

See also Connolly v. Des Moines and Central Iowa Ry. Co., 246 Iowa 874, 887, 68 N.W.2d 320; Minar v. Skoog, 235 Minn. 262, 50 N.W.2d 300; Master Laboratories, Inc., v. Chesnut, 154 Neb. 749, 49 N.W.2d 693, 696; Strong v. Moore, 105 Ore. 12, 207 P. 179, 23 A. L. R. 1217, 1222.

In determining whether the lessee had exercised the option to purchase we must analyze the evidence presented. We can thus ascertain whether the acceptance, as claimed by the defendant, was positive and unequivocal. In Mr. Divine's testimony we find the statements which the defendant-company maintains indicate the exercising of the option: "A. Walter Heaton said to Mr. Hunter, 'Mr. Hunter, we are going to exercise the option and we want to go into with you the amount that we have paid, that is out of the rent that we have already paid towards the purchase of the building.'"

In the testimony of Walter Heaton we find the following: "* * * I told Mr. Divine that Mr. Hunter and I had been talking. We wanted to exercise the option and we wanted to know how much we had paid in as rent, what the taxes were and what was to be deducted and allowed on the purchase price of this building." It will thus be observed one witness stated: "We *are going to exercise* the option" and the other testified: "We *wanted to exercise* the option." (Italics supplied.) We do not find in the entire testimony of either of these witnesses any positive or unequivocal acceptance or exercise of an option to purchase. At the most it is an indication of a possible later action. Likewise it cannot be said the claimed exercising of the option was so positive and unequivocal as to result in a contract

for any certain amount, payable in any particular manner, and at any definite time.

II. It is contended by the defendant-company the notice of the exercising of the option was given orally. It is true an oral notice of an exercise of an option to purchase may be given. 51 C. J. S., Landlord and Tenant, section 82(b), page 640; 91 C. J. S., Vendor and Purchaser, section 10, pages 855, 856; Mauzy v. Elliott, 146 Neb. 865, 22 N.W.2d 142, 146; San Antonio Joint Stock Land Bank v. Malcher, Tex. Civ. App., 164 S.W.2d 197, 200. However, it should be kept in mind when Mr. Hunter indicated his company was not interested in a monthly partial-payment contract or some other type of financing as indicated by the testimony of Mr. Divine and Mr. Heaton, they, on behalf of the defendant-corporation, did not then write the plaintiff and give a written notice of its intentions. Nor did it then bring an action for specific performance but waited for over a year and a half to do so and then only after the plaintiff had brought its action to quiet title. The request for the furnishing of an abstract is not essential to evidence an exercise of an option. However, the failure to ask for one is a circumstance which, along with other facts, may be considered in determining whether the option had been positively and unequivocally exercised.

III. The defendant-company continued to pay rent and so marked its checks. In its income tax returns since February 1954 the defendant took deductions for rent. Of especial importance is the testimony of Mr. Garberson who testified Mr. Heaton stated several times the defendant had not exercised the option of purchase. There are other indications the defendant had not exercised its claimed option, but we will not set them out.

IV. The burden is on the defendant to show positively it had exercised its option if it is to sustain its contention it is entitled to specific performance. 91 C. J. S., Vendor and Purchaser, section 80, pages 959, 960. This it has failed to do.

It is also true the burden is on the party seeking specific performance to establish the contract by clear, satisfactory and convincing evidence. Lockie v. Baker, 206 Iowa 21,

24, 218 N.W. 483, 484. See also Baker v. Fowler, 215 Iowa 1157, 1159, 247 N.W. 676. And in the Lockie v. Baker case, supra, it is stated:

"Contracts, to be specifically enforced, must be so certain and definite in their terms as to leave nothing to conjecture, or to be supplied by the court. The terms must be certain and complete in themselves. Marti v. Ludeking, 193 Iowa 500. A court of equity may properly refuse specific performance of an agreement of doubtful mutuality. The minds of the parties must fully meet on the terms of the contract sought to be specifically enforced. Briles v. Goodrich, 116 Iowa 517."

It is our conclusion the defendant-corporation has not sustained the burden of proving a contract of such definite terms that specific performance should be required.

Inasmuch as the defendant has not shown it is entitled to specific performance the prayer of the plaintiff's petition to quiet title in it must be sustained. As the defendant has not sustained its burden of showing it had exercised its option we do not deem it necessary to comment on the necessity of a tender of the purchase price and other matters raised in this appeal. For the reasons stated we affirm the trial court.—Affirmed.

All JUSTICES concur.