KATHRYN SUE VILTER, JANE POTTER BUCHANAN, as guardian of person and property of Sandra Diane Potter Buchanan, a minor, appellees, v. ANNA A. MYERS, as executrix and trustee of will of Paul D. Potter, deceased, et al., appellants.

No. 51013.

(Reported in 123 N.W.2d 334)

820

Hemingway & Hemingway, of Webster City, for appellants.
Karr & Karr, of Webster City, for appellees.

THORNTON, J.— ▮▮▮▮ The principal question presented is the sufficiency of the evidence of the making and terms of the contract to execute mutual wills. Able counsel for both sides recognize this and so present the case. That the evidence of such an oral contract must be clear and convincing is well established. Youngberg v. Holstrom, 252 Iowa 815, 108 N.W.2d 498; Father Flanagan's Boys' Home v. Turpin, 252 Iowa 603, 106 N.W.2d 637; Barron v. Pigman, 250 Iowa 968, 95 N.W.2d 726; and In re Estate of Ramthun, 249 Iowa 790, 799, 89 N.W. 2d 337, 342. Since In re Estate of Lenders, 247 Iowa 1205, 78 N.W.2d 536, a greater quantum of proof than the mere execution of the wills is necessary to establish the wills as contractual. The proof may be by extrinsic evidence or it may appear on the face of the wills, or both. In re Estate of Logan, 253 Iowa 1211, 1216, 115 N.W.2d 701, 704, and citations. The general principles of equity which control specific performance apply to a contract to execute a will. Levis v. Hammond, 251 Iowa 567, 576, 100 N.W.2d 638. To entitle the promisee to relief in equity such as specific performance the contract must be clear and definite. 4 Page on Wills, Lifetime Ed., section 1739. The contract must be so certain and definite as to leave nothing to conjecture or to be supplied by the court. Hunter Investment, Inc., v. Divine Engineering, Inc., 248 Iowa 1109, 1121, 83 N.W.2d 921.

▮▮▮ One problem not heretofore squarely presented or

passed on by us is the will of the survivor, Paul, alleged to have been executed in conjunction with Laura's in 1938, was lost and there was no proof of its contents. At this point defendants contend the same proof is necessary as to prove a lost will, i.e., (1) its due execution; (2) its loss; (3) the presumption of its intentional destruction with intent to revoke has been rebutted; and (4) its contents. In re Estate of Givens, 254 Iowa 1016, 1019, 119 N.W.2d 191, 193; In re Estate of Lawrence, 251 Iowa 305, 309, 100 N.W.2d 645, 649, and citations. We agree this is the proper test except that (3) above should be determined as of the date of the death of the first to die.

Our review in equity is de novo. Rule 334, Rules of Civil Procedure. It is our duty to consider and determine the case anew. Snater v. Walters, 250 Iowa 1189, 98 N.W.2d 302.

Because of the volume of evidence in the record, much of which is wholly immaterial and actually has more bearing on another action between these parties, after a brief statement of facts we will confine ourselves to a consideration of the particular matters of evidence as considered by the parties.

Laura and Paul Potter were married in 1913. They had two children, Kathryn Sue Vilter, 47 at time of trial, called Sue by the family, and Robert O. Potter. Robert lost his life in World War II in November 1944; one daughter, Sandra, survives him. Sue and Sandra, by her guardian, are plaintiffs here. Defendants are the executor and trustee and beneficiaries of the will of Paul executed in 1959. Laura died October 18, 1945; Paul January 18, 1960. Paul had a doctorate in chemistry and from 1913 to late in 1938 he was employed as a chemist by the same firm in Chicago. He had a salary of $4800 per year at least during the last 12 to 14 years. In 1923 Laura received an inheritance of $24,000 from her grandmother. June 10, 1938, Laura executed her will. There is evidence to sustain a finding that sometime later in the year 1938 Paul also executed a will. This will is lost. During this time Laura and Paul lived in the Chicago area and in 1938 owned a home in Winnetka, Illinois. July 18, 1938, Laura and Paul purchased a 160-acre farm in Hamilton County taking title as tenants in common. After Paul's employment was terminated they moved to Webster City.

At this time they owned some stocks in joint tenancy. June 8, 1940, Laura's mother, Nellie L. Crauel, conveyed a home in Webster City to Laura and Paul as tenants in common. December 31, 1941, Laura and Paul purchased a 240-acre farm taking title as tenants in common. December 29, 1942, they deeded 80 acres of this farm to Robert. During the years after the execution of Laura's will until her death there is evidence by Sue that Paul tried to persuade Laura to change her will. Some 18 months before her death Laura became afflicted with an incurable cancer.

August 2, 1944, Robert and his wife executed Exhibit 5 in the record. This instrument is in the nature of a family settlement.

November 29, 1944, Laura and Paul by instrument called a "joint tenancy agreement" changed their title to the home from tenants in common to joint tenants. This instrument was recorded November 29, 1944.

December 11, 1944, Laura and Paul executed a joint tenancy agreement to the 160-acre farm purchased in 1938 changing their title from tenants in common to a limited joint tenancy, limiting the ownership of the survivor of them in effect to that of a life tenant with the remainder to Sue or her heirs. On the same date a similar instrument was executed by Laura and Paul to the 160-acre farm purchased in 1941 with the remainder to Robert or his heirs. Both of these instruments were recorded December 5, 1945, after Laura's death.

Sue testified she received a number of letters from her mother during the year 1943 or 1944 and one of them contained a document wherein her mother and father agreed to will their property to each other and then to the children.

January 16, 1946, Paul commenced a short form probate proceedings to remove tax liens on joint property held by Laura.

After Laura's death, her mother, Mrs. Crauel, lived in the home with Paul. She died in 1950, Paul was coexecutor with Sue of her estate and trustee for Sandra and Sue's son under Mrs. Crauel's will. This lady was wealthy and the principal source of the funds with which Laura and Paul made initial payments on the two farms held by them as joint tenants.

Paul died by his own hand January 18, 1960. After the withdrawal of objections to the probate of his 1959 will by plaintiffs here the will was admitted to probate December 5, 1960. Plaintiffs have had Laura's will admitted to probate March 7, 1961, after objections filed by defendants here were dismissed on motion.

In this action the trial court entered a decree awarding all of the property, real and personal, owned by Paul at his death, to plaintiffs Sue and Sandra.

I. Defendants' first contention is the proof is insufficient. Plaintiffs in argument point to six important elements of their proof: (1) the 1923 oral agreement; (2) 1938 wills of Laura and Paul; (3) Exhibit 5; (4) joint tenancy agreements; (5) 1944 agreement of Laura and Paul as testified to by Sue; and (6) Paul's conduct.

First we will examine the evidence on the 1938 wills and the 1944 agreement as testified to by Sue. All other is circumstantial.

Laura's 1938 will, her only one, so far as this record shows, was proved by the testimony of one of the witnesses thereto taken by deposition. The witness's testimony shows the will was executed in a bank in Wilmette, Illinois, where Laura was a customer. There is no other testimony as to surrounding circumstances. The will in pertinent part provides, after the payment of debts, Paul shall have the home and furnishings in Winnetka outright; Sue and Robert were given jewels, share and share alike; and

" 'The entire residue of my property of every kind whatsoever which I now have, may die possessed of or may be entitled to, I give in trust to Paul. D. Potter as Trustee for himself, for Kathryn Sue Vilter, her heirs or assigns, and for Robert Owen Potter, his heirs or assigns, to be used, distributed and assigned as hereinafter stated.' "

(Sue and Robert were appointed successor trustees.)

" 'As trustee's compensation I authorize Paul D. Potter to pay to himself all of the income from all of the property of which I am possessed at the time of this writing or may acquire by means other than by gift or inheritance and have not above

824

provided for so long as he shall live. Further, if for any reason he cannot serve as Trustee, I order the payment of all such income to him so long as he shall live by his successor trustees or trustee.' "

After Paul's death provision was made for the distribution to Sue and Robert or their direct heirs of " 'all of the property which I hold at the time of this writing subject to gains or losses as the case may be or may acquire by means other than by gift or inheritance * * *' " and in a succeeding paragraph the trustee was required to pay one half the income to Sue from " 'all of the property I may hereafter acquire by gift or inheritance' " until March 2, 1949, and then to assign her one half of all such property; the same was provided for Robert until January 15, 1954. The following paragraph required the trustee to be accountable to the Probate Court and make annual reports:

" 'For good and sufficient reason I do hereby contract and agree that any future effort on my part to modify or invalidate this will in so far as it affects the property that I have at the time of this writing, subject to gains or losses, as the case may be, or my husband, Paul D. Potter, in respect to his right to serve as administrator and trustee or in respect to his right to the income from the property that I now have, subject to gains or losses, as the case may be, shall and should be considered null and void unless agreed to in writing by Paul D. Potter. I do, however, specifically reserve the right to attach any number of codicils to any or all copies of this Will that I may desire which relate to property that I may hereafter receive by gift or inheritance and in which I can, if I so desire, appoint an administrator other than Paul D. Potter for all such property and in which I can change my disposition of such property in any manner I may hereafter desire.' "

Paul was named executor.

If there is evidence of a written agreement to make mutual wills at that time it must appear from the last quoted paragraph of Laura's will. Clearly standing alone it is insufficient. It does say, " 'For good and sufficient reason I do hereby contract and agree' " but this does not point to a similar agreement by Paul. What her reason was is not expressed. It is not explicit

as is the agreement in the joint will in In re Estate of Logan, 253 Iowa 1211, 1212, 1213, 115 N.W.2d 701, 702, 703. The provision is in favor of Paul and does require his consent to a change as to the property she owned on the date of the will, Paul's right to serve as executor and trustee, and " 'his right to the income from the property that I now have.' " This paragraph does not contain, "or may acquire by means other than by gift or inheritance" as does the paragraph providing for Paul's compensation as trustee. Perhaps this is a patent ambiguity, as Laura retains the right to change her will only as to property she "may hereafter receive by gift or inheritance." The trial court stated this clause was indicative of an agreement with Paul as to the disposition of their property. We think that is all it is. At most it could not control property of Paul not then owned by him or acquired by gift or inheritance. His contract could not be more burdensome than Laura's. But that is only speculation and conjecture. She made a limited agreement, his may have been more or less so.

As stated, there was proof sufficient to prove due execution of Paul's 1938 will and it is lost. But there is no proof of its contents. Perhaps he did will all of his property to his wife and children, but there is no proof of it. The two witnesses to his will did testify as to the date of witnessing Paul's signature. Mr. Wm. E. Koss testified, "My best guess as to the time was sometime in 1938, * * *." According to this witness this occurred prior to the time Paul left his employment as a chemist, in September or October of 1938. Mr. L. Lewis testified Paul left the company in December or November of 1938, and could not say what year he witnessed Paul's signature.

One of the circumstances to prove an oral contract is that the wills were executed at substantially the same time. In Johansen v. Davenport Bank and Trust Co., 242 Iowa 172, 176, 46 N.W.2d 48, we held wills executed one hundred and ten days apart were not executed at substantially the same time. This record does not show when Paul's will was executed. It could have been as little as ninety days or as much as six months from the date of Laura's will.

Barron v. Pigman, 250 Iowa 968, 95 N.W.2d 726, has some

826

similarity on the question of the contents of the survivor's will. There plaintiff had the benefit of the positive testimony of the attorney who drew the wills as to the surrounding circumstances, some evidence the will was in existence after the death of the first to die, and an original duplicate of the survivor's will.

The statements contained in Laura's will and the circumstances of Paul's will as shown are not clear and convincing evidence that an agreement was then made or of the terms of the agreement to warrant specific performance, unless, however, by some act or statement Paul has acknowledged such a contract.

II. Before turning to Paul's conduct we will examine the 1944 agreement testified to by Sue. Her testimony is brief and is all of the testimony in the record on this subject. She testified:

"* * * in 1943 * * * we were living 3725 Wilson Avenue, Cincinnati, Ohio; and while there I received lots of letters from my mother. At that time I was familiar with and able to recognize the signature of my father and mother. I received one containing a document. In recent months, I have made a search for that document. I have not been able to find it. I have no knowledge or idea of where it might be.

"Q. Did you read this document when you received it from your mother? A. Well, I think so, yes.

"Q. What did you do with it at that time? A. Well, I remember it in the drawer, but that's all.

"Q. Will you relate what was in that document? (Objection) A. My mother and father's signatures were signed to that document. I remember seeing it again in 1957, approximately, and I believe that it was fully executed and notarized document.

"Q. Will you relate in your own words as nearly as possible the contents of that document? (Objection) A. As I recall the contents of the document it was a simple statement that we, Laura B. Potter and Paul D. Potter, have agreed together to will our property to each other and then the survivor would agree to will to the children of these people.

"I believe the document was dated in 1944. I don't believe I ever saw a copy.

"Q. Do you know whether or not Mr. and Mrs. Buchanan have made a search for a copy of this document to which you have referred? A. No; I really don't."

This testimony is inherently weak. The witness does not entirely lack the necessary testimonial elements of observation and recollection, but her very testimony shows her weakness in these regards. Her observations are eighteen and five years old as well as no indication of thorough examination of the document at either time. It does not appear the document was important to her at the time. For an example of evidence satisfactory to prove the existence and contents of a lost contract see Scott v. Brenton, 168 Iowa 201, 150 N.W. 56, where besides the testimony of the one claiming under the contract at least eight witnesses testified, some as to the existence and contents, others just to the existence of the document. It also appears Sue may have received a copy of Exhibit 5, a document that bears some resemblance to the one she described, at or about the same time. Her recollection of signing Exhibit 5 was that she did not, but she finally conceded she must have. And, at about the same time Laura and Paul were changing their real-estate titles from tenants in common to joint tenants.

This claim of a 1944 agreement to execute wills is inconsistent with the claim made as to Laura's 1938 will. Laura did not act on this 1944 contract.

The evidence of the existence and contents of this 1944 contract is not sufficiently clear and definite upon which to base a decree of specific performance. Compare Stewart v. Todd, 190 Iowa 283, 293, 294, 173 N.W. 619, 180 N.W. 146, 20 A. L. R. 1272.

III. Sue's testimony her father tried to persuade her mother to change her will has some of the same testimonial weaknesses of her testimony bearing on the 1944 contract. If we assume he did so we must determine that his reason for so doing was to avoid a contract to will property to plaintiffs or his action does not sustain plaintiffs' theory. One theory for his reason which is at least as probable as plaintiffs' is found on the face of Laura's will and the circumstances of Paul and Laura in 1938. The will, after giving him the home in Winnetka, provides

he shall receive the income from the property Laura had at the time and may acquire other than by gift or inheritance. From the property she then had the income would not be large. She was not then ill. The record does not show any illness then but does show her illness some 18 months before her death. Her mother, Mrs. Crauel, was a wealthy woman, Laura and her family were the closest objects of her bounty. That Laura would acquire more property other than by gift or inheritance was extremely doubtful, but that she would receive gifts and a substantial inheritance from her mother was quite probable. That Paul sought a change to allow him to share in the income from gifts and inheritance is just as probable as that he wanted to avoid a mutual will contract.

IV. Exhibit 5 is a document that both parties agree or take for granted was prepared by Paul. Such is its only logical source. However, we are unable to agree with either side that it amounted to a contract. From it plaintiffs claim Paul agreed to will all his property to plaintiffs. Defendants claim that it amounts to an abandonment of any such contract. If it has any value here it is because it contains declarations against interest by Paul. Under the circumstances at the time of its preparation some statements therein are self-serving as to Paul. It purports to be addressed to some court, the Probate Court handling her estate. It recites Laura's illness and the fact Robert is in service and in event of Laura's death while Robert is in service her will will be probated. It states an understanding of the will, it classifies Laura's property into (1) that owned by her at the time of executing the will and (2) gifts and inheritances; the property included in (1) is to be placed in trust, Paul to have the income therefrom during his life and thereafter divided between Sue and Robert. It states the property under (1) is now, securities held in joint tenancy with Paul that would become Paul's outright on Laura's death, and the home in Webster City and the two farms all three of which were held in half interest with Paul. It asks the court to set aside the will in favor of giving Paul an outright deed to the home and a deed to one farm to Paul with Sue or heirs as his survivor and to the other to Paul with Robert or heirs as his survivor. It indi-

cates Sue and her husband and Paul will file similar petitions. (This one was signed by Robert and his wife.) It states favorable action will insure Paul of ownership of the home, give him a feeling of ownership of the farms, and insure inheritance of the farms by Sue and Robert. And states the belief this will more than carry out Laura's will and insure inheritance by the children of "the very large part (i.e. Laura B. Potter's share) of the property involved which is now owned in half interest with Paul D. Potter but will also insure ultimate inheritance by the same heirs of the half interest held in these properties by Paul D. Potter." And states it does not affect the property which Laura has or may acquire by gift or inheritance. This document was never filed anyplace. The copy placed in evidence, signed by Robert, was found in a strongbox after Paul's death. There is no indication Paul ever signed a similar instrument and very little Sue did. Of course Laura did not. Actually everything sought to be accomplished by the exhibit was accomplished while Laura was still alive the same fall by the execution of the joint tenancy deed to Paul to the home and the joint tenancy agreement ultimately giving one farm to each of plaintiffs. It accomplished nothing. The statement contained therein of the understanding of Laura's property at the time of her will is self-serving. Both parties concede the home in Webster City was a gift from Mrs. Crauel, Laura's mother. Laura and Paul held title as tenants in common. If no change was made in Laura's will Paul would own one half of the home, the other half would be in trust and he would not be entitled to income from such one half. The statements relative to insuring inheritance by the children of Paul's interest and carrying out Laura's will cannot reasonably be stretched into meaning the carrying out of a mutual will contract. Mutual wills are not mentioned. Paul's will is not mentioned. (The fact that the children are the natural objects of the bounty of both Laura and Paul and everything Paul has done indicates his desire they receive the farms is not evidence of a mutual will contract. If it is, every mother and father are in the same situation.)

Plaintiffs contend the fact Paul listed the securities held

in joint tenancy as being part of the property owned by Laura at the time of drawing the will must be taken to show he had a binding agreement for the disposition of the securities or he would not have so listed them. This does not follow. In listing the securities he said, "(a) Certain securities which upon the death of Laura B. Potter will become outright the property of Paul D. Potter as joint tenant with right of survivorship." This seems a plain statement that the securities will be his on her death. All other references in the exhibit appear to be to the farms, not the securities. Certainly this is not a clear and convincing admission of a mutual will contract.

V. The short form probate proceedings show all but very little of Laura's property, the securities, home and two farms were placed in joint tenancy by Laura and Paul. There is no suggestion of fraud or any bad faith in connection with these transfers. Apparently some at least of the securities were purchased that way. As a practical matter nothing was left to carry out the trust provisions of Laura's will, she must have known that. When husband and wife so arrange their property as to render impossible the prior plan of disposition it is certainly strong evidence of abandonment of such plan. See Hale v. Campbell, 46 F. Supp. 772 (N. D., Iowa, 1942). It is not necessary to so hold in this case because of the nature of the evidence of the original plan.

Paul's conduct and statements made in relation to the short form probate proceeding are claimed to be evidence of either the 1938 contract or the 1944 contract, or both. We do not find anything he said or did points to such. In each instance other explanations are more reasonable. In the course of making the estate tax return Paul stated since 1923 when Laura received an inheritance of $24,000 they "orally agreed that they should own their properties in equal shares." (This is the 1923 agreement.) No reason appears why this statement should be interpreted beyond just what it says. To own property in equal shares is no indication of the execution of a mutual will contract.

He wrote a letter to Sandra's mother and guardian wherein he stated, "* * * what I am doing in regard to Mom's estate is

for *tax purposes only.* I have a personal ambition to leave the situation such that the farm interests will pass to Sue and you and Sandy as nearly automatically as possible and free from any kind of debt. But in doing this I am not doing anything else that is or could be detrimental to your interests or Sandy's."

Here again the more reasonable inference is just what is said. The purpose of a short form probate proceedings is to clear title to joint property from tax liens and to obtain tax clearances or waivers in order that securities will be transferred by transfer agents and government officials in the case of United States bonds so held.

The statement that what was being done was for tax purposes and Paul's statement in a letter to his attorney about the problem of his right to transfer securities are referable to the handling of short form probate proceedings. They are not an admission of contractual wills.

In the course of the short form probate proceedings Paul does acknowledge Laura's will as a verity. He also acknowledges that he has taken over all of Laura's property and states the annuity value of the interest each person will receive under Laura's will for inheritance tax purposes.

He took most of her property as a surviving joint tenant. The jewelry should have been distributed to plaintiffs. The fur coat would hardly be held in trust. The remaining property would not pay the taxes and costs of administration.

We have carefully examined every act and word by Paul in the short form probate proceedings. He did attempt to minimize taxes by showing Laura contributed not more than one half to jointly owned property. He also tried to include property solely owned by him in an attempt to show the property was owned in equal shares. He was not successful. However, every act and word of his would have been the same whether or not Laura and he had executed contractual wills. None of these amounts to an admission of contractual wills.

Paul did not, as claimed by plaintiffs and found by the trial court, hold any property in trust under Laura's will. There simply was not sufficient property to place in trust and there was no attempt to comply with her will in that respect.

Paul did act as a coexecutor and trustee under the will of his mother-in-law, Mrs. Crauel, and the same persons were beneficiaries, but this has nothing to do with the issue here.

VI. A further word on the 1923 agreement. Paul made a statement in the estate tax return in the short form probate proceedings as above pointed out. In Exhibit 11, a document prepared by Paul in his handwriting containing a statement by him bearing on the source of their property and how they held it as well as yearly inventories showing the property held by each, is this statement:

"During the year 1923, Laura B. Potter inherited $24,000. At the time of this inheritance, there was an agreement between Laura B. Potter and Paul D. Potter to the effect that every possible effort would be made to keep this money intact, that no immediate effort would be made to modify titles but that all the property would be regarded as belonging in half interest to each party, * * *."

Paul's attorney referred to this agreement in a letter bearing on the taxes due incident to the short form probate proceedings. The fact husband and wife agree to own property received or owned by either of them in equal shares does not lead to the conclusion they executed or agreed to execute mutual wills.

VII. Plaintiffs claim the joint tenancy agreements whereby the survivor of Laura and Paul was limited in the estate received in that they could not encumber or dispose of the land, and title ultimately vested in their heirs, constitute full performance on Laura's part of the contract to will their property to their children. This presupposes such a contract. It is not solely referable to such a contract. The document is unusual and does prevent alienation by one of two surviving joint tenants. It is not necessarily inconsistent with such a contract. On the other hand it is not consistent with one. At the time it was made it was reasonably probable that Paul would outlive Laura. They were tenants in common of the farms. If there was a binding agreement to will all property on death to the children there was no need for the agreements to insure the farms would ultimately fall to the children. If

there was not, there was a need to insure the result obtained. It is also true Laura and Paul may have thought this manner was simpler than contractual wills. Again these are matters of speculation.

 VIII. Plaintiffs also argue Paul by his actions in handling Laura's estate intended to comply with the mutual wills, but that when he drank to excess he lost sight of this and his last will was more or less an unintentional act. There is some evidence of drinking to excess for a short time. This was in 1950. Paul drew a will in 1957 wherein he gave Mrs. Myers a bequest of $5000 and all the rest to Sue and named her as executrix. This, of course, was inconsistent with the contract now claimed. In a letter written to a bank in Webster City in 1951 to the attention of one of the officers, he wrote, "Under my will you are the administrator of my estate." This would hardly have been his 1938 will while he was living in Chicago. In his last will executed in 1959 he does state Mrs. Myers' appointment is made with her full knowledge and consent and under conditions that it was obvious that she had not exercised undue influence in the matter. Such a statement naturally is suspect. Here it is more easily explained by reference to the 1957 will in which Sue was named executrix and principal beneficiary.

The evidence indicates some dissatisfaction arose between Sue and her father, this probably accounts for the change in the 1957 and 1959 wills but has little if any probative value to establish the execution of contractual wills in 1938 or a contract to will property in 1944.

 Plaintiffs' whole case is built on Laura's will and Sue's testimony of the 1944 contract together with Paul's actions and writings including Exhibit 5 and the joint tenancy agreements. Laura's will and the 1944 contract as testified to are insufficient standing alone. They do not complement one another. Nor are any of Paul's writings including Exhibit 5 and the joint tenancy agreements solely referable to contractual wills. Each item of evidence claimed to show contractual wills is subject to inconsistent inferences. None of them shows an admission by Paul at anytime of such a contract. Mere volume of this type of

834

evidence does not make the proof clear and convincing. Some 196 exhibits were introduced in evidence, most of these exhibits were Paul's writings. In none of them did he mention or refer to a 1938 will or a 1944 contract between Laura and him to will property to their children.

The evidence of the claimed contracts is not clear and convincing. It follows the decree of the trial court must be and is hereby reversed and the case remanded with directions to dismiss plaintiffs' petition.—Reversed and remanded.

All JUSTICES concur.